**In re Eric J. BLATSTEIN, Debtor.**

**In re MAIN, INC., Debtor.**

**718 ARCH STREET ASSOCIATES, LTD., et al., Plaintiffs,**

**v.**

**Eric J. BLATSTEIN, et al., Defendants.**

**Nos. 96–31813DAS, 96–19098DAS.**

**Adversary Nos. 97–0004, 97–0008.**

**Civ.A. Nos. 97–CV–7063, 97–CV–7064, 97–CV–7066, 97–CV–7069 and 97–CV–7070.**

United States District Court, E.D. Pennsylvania.

Sept. 23, 1998.

---

Edward J. DiDonato, DiDonato and Winterhalter, Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Debtors.

Steven M. Coren, Kaufman, Coren & Ress, Mitchell W. Miller, Eric L. Frank, Miller, Frank and Miller, Michael H. Kaliner, W.J. Winterstein, Jr., Naderson, Kill & Olick, P.C., Philadelphia, PA, for Plaintiffs.

Mary F. Walrath, Jacoby, Donner & Jacoby, P.C., Kevin J. Carey, Mesirov Gelman Jaffe Cramer and Jamieson, Philadelphia, PA, for Defendants.

Frederic Baker, Assistant U.S. Trustee, Philadelphia, PA, Trustee.

## OPINION

KAUFFMAN, District Judge.

### I. INTRODUCTION

Before the Court are cross-appeals from the Bankruptcy Court's September 8, 1997, and October 7, 1997 Opinions in these consolidated adversary proceedings. The Chapter 7 debtors in these bankruptcy cases, and defendants in these adversary proceedings, Eric J. Blatstein ("Blatstein") and Main, Inc. ("Main"), a corporation controlled by Blatstein, have appealed the Bankruptcy Court's holding that Blatstein and his long-time accountant, Morris Lift ("Lift") orchestrated a series of "sham" transactions designed to strip Main of its only asset—the Philly Rock Bar and Restaurant ("Philly Rock")—to prevent the plaintiff in these adversary proceedings, 718 Arch Street Associates ("Arch"), from collecting a $2.7 million default judgment that it obtained against Main in November, 1993.[1] Blatstein also appeals the Bankruptcy Court's holding that, as a consequence of his alleged efforts to thwart Arch's collection of its judgment, he should be denied his personal bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

Lift, also a defendant in the adversary proceedings, appeals the Bankruptcy Court's holding that his July 25, 1996 public foreclosure on Main's assets and subsequent transfer of those assets to Columbusco, Inc. ("Columbusco") must be set aside pursuant to Pennsylvania's Uniform Fraudulent Transfer Act. Lift also appeals the Bankruptcy Court's rejection of the $492,415.41 Proof of Claim that he filed in connection with the Main bankruptcy case.

The Bankruptcy Court found in Blatstein's favor on two issues. Chief Judge Scholl held that: (1) Blatstein's alleged transfer of in excess of $1 million to accounts maintained in the name of his wife, Lori Blatstein, was not fraudulent;[2] and (2) Arch had failed to carry its burden in its claim for alter-ego liability on the non-debtor corporate defendants.[3] Arch appeals both of these rulings.[4]

### II. FACTUAL BACKGROUND

Blatstein has owned and operated nightclubs and restaurants in Philadelphia for decades. Presently, his establishments in Philadelphia include Philly Rock, the Engine 46 Steakhouse, and the Maui nightclub. He owns and operates each of these establishments as a separate corporation.[5] As a result of tax liens and other credit problems, Blatstein has had difficulty obtaining financing for his new restaurants from commercial lenders. See In re Main, Inc., 213 B.R. 67, 75, 94 (Bankr.E.D.Pa.1997). Accordingly, he borrows start-up funding and operating capital from various business associates, including Lift and Gayle and Harold Beratan ("the Beratans").[6] 213 B.R. at 75. At trial, Lift produced canceled checks made out to the corporate defendants (or to third-parties on their behalf) totaling $530,758.86 and can-

---

1. The Court will refer to Blatstein, Main, and Lift collectively as "Defendants."

2. The Bankruptcy Court found that funds were kept in Ms. Blatstein's name because of Blatstein's tax liens and credit problems, not to prevent Arch from collecting its judgment.

3. The Bankruptcy Court found that all of the corporations maintained separate books, records, and bank accounts, and that inter-corporate

transfers amounted to less than 4% of combined revenues.

4. The issues on appeal before this Court are described in detail infra pp. 147–48.

5. Blatstein and his wife Lori are the sole shareholders of Main and the non-debtor defendants (as tenants by the entireties).

6. The Beratans are not parties to these proceedings.

celed checks evidencing loans from the Beratans totaling $790,200. 213 B.R. at 89–90. The Beratans also purchased a loan from Marian State Bank ("Marian"), originally made to Lift on behalf of Main, that had gone into default. 213 B.R. at 75–76.

In 1987, Blatstein opened the Phoenix nightclub at 718 Arch Street in Philadelphia. *In re Main, Inc.*, 207 B.R. 832, 835 (Bankr. E.D.Pa. Apr. 23, 1997), *aff'd in part, rev'd in part*, No. Civ. A. 97–CV–3739, 1997 WL 560119 (E.D.Pa. Aug. 26, 1997). On behalf of Archco, Inc., the corporation formed to own the nightclub, Blatstein executed a lease with Arch, the property's owner, that extended through the year 2003. 207 B.R. at 835. In March, 1988, the parties executed a new lease, permitting Arch to increase the square footage of the premises and providing for specified monthly payments over a fifteen-year lease term. *In re Blatstein*, No. 97–CV–3739, 1997 WL 560119, at *1 (E.D.Pa. Aug. 26, 1997). In addition, Arch loaned Blatstein $227,180 for operating expenses, obtaining a security interest in the nightclub's furniture, fixtures, and equipment. 1997 WL 560119, at *1.

In 1989, Archco filed a Chapter 11 bankruptcy proceeding in which it elected to assume the lease with Arch. 207 B.R. at 835. The bankruptcy failed to resolve Archco's financial difficulties, however, and on January 31, 1992, Arch and Blatstein entered into a letter agreement modifying Archco's payment obligations to cure rent arrearages. 1997 WL 560119, at *2. Under the letter agreement, Archco's failure to satisfy the modified payment schedule would constitute an event of default for which it had seven days to cure. 1997 WL 560119, at *2. On April 6, 1992, following Archco's breach of the terms of the letter agreement, Arch gave Archco and Blatstein notice of default. 1997 WL 560119, at *2. On the evening of April 6th, the Philadelphia Police prevented Blatstein from emptying the nightclub's contents,

and Arch padlocked the premises.[7] 207 B.R. at 835.

On November 12, 1992, Arch entered a confessed judgment against Archco and Blatstein for $2,774,803, representing past due rent and future accelerated rent from the date of the breach in April, 1992 through the expiration of the lease term in 2003. 213 B.R. at 75. On December 8, 1992, Blatstein petitioned to open the confessed judgment, claiming that by padlocking the nightclub doors, Arch prevented Blatstein from curing the default. 1997 WL 560119, at *2. The Common Pleas Court denied Blatstein's petition and, on appeal, the Superior Court of Pennsylvania affirmed, concluding that Blatstein's attempt to remove furniture and fixtures from the nightclub was an act of abandonment entitling Arch to immediate repossession. *Id.* at *2. The Superior Court found "void of any arguable merit" Blatstein's contention that Arch prevented him from curing the default by padlocking the nightclub premises. *718 Arch Street v. Blatstein*, slip op. at 4–5, 433 Pa.Super. 624, 636 A.2d 1223 (Pa.Super. Aug. 31, 1993).

In September, 1989, more than three years before Arch obtained its confessed judgment against Archo, Blatstein had formed Main to operate a new restaurant, which eventually opened in 1991 as Philly Rock. 213 B.R. at 96. To document the outstanding loans owed to Lift by Blatstein's establishments that had closed,[8] and in consideration for the start-up financing that Philly Rock would need, Main executed a series of judgment notes to Lift, including a January 31, 1989 judgment note for $500,000, an October 14, 1991 judgment note for $50,000, and a February 15, 1992 judgment note for $140,000. 213 B.R. at 75.

The Bankruptcy Court found that Blastein executed the January 31, 1989 judgment note for the "old loans of the failed businesses and allegedly told Lift at that time that he and Main would pay off the debts of the old corporations to him as a condition of his

---

7. On June 1, 1993, Arch re-leased part of the premises to Illusions, Inc., which was also a nightclub operator. Illusions provided Arch with a security deposit of $11,000 and monthly rent of $5,500. In October, 1994, Arch's mortgagee foreclosed on the property, terminating Illusion's lease. 207 B.R. at 836.

8. In addition to Archco, these entities included Walnut Federal, Inc., which operated a restaurant and nightclub, and Boulevardco, Inc., which operated a sports bar.

loans to the new corporations." 213 B.R. at 90. The Bankruptcy Court further noted that "[b]oth Lift and Blatstein testified that the $520,000 was used to capitalize Main and get Philly Rock off the ground." 213 B.R. at 90. At trial, Defendants' expert testified that "it was not improper nor unusual for Lift to insist that payment of the old debts occur before he loaned any additional monies to new entities." 213 B.R. at 91.

On May 28, 1992, following alleged defaults on the notes, Lift entered confessed judgments against Main for $43,229.50, based on the October, 1991 note, and for $174,443.40, based on the February, 1992 note. 213 B.R. at 74. On the day he obtained these judgments (totaling $217,672.90), Lift filed Uniform Commercial Code ("U.C.C.") financing statements with the Commonwealth of Pennsylvania referencing "virtually all of Main's assets, i.e., its liquor license, furniture, equipment, trade fixtures, inventory, cash and non-cash proceeds of the assets." 213 B.R. at 74. On November 12, 1992—the same date on which Arch obtained its confessed judgment against Archco—Lift filed a third confessed judgment against Main for $481,-411.30 based upon an alleged default on the January 31, 1989 judgment note. 213 B.R. at 74. Lift also filed a U.C.C. financing statement in connection with this confessed judgment. 213 B.R. at 75.

Shortly after Arch obtained its $2.7 million confessed judgment against Archco, it began serving interrogatories in aid of execution on corporations then owned by Blatstein, including Main. 1997 WL 560119, at *3. In November, 1993, following Main's failure to respond to Arch's interrogatories or appear at a scheduled assessment of damages hearing, the Common Pleas Court entered a default judgment against Main for $2,774,803—the full amount of Arch's judgment against Archo and Blatstein. 1997 WL 560119, at *3.

In February, 1996, on the basis of its default judgment, Arch garnished $56,228.51 from Main's account at Jefferson Bank. 213

B.R. at 75. In response to the garnishment, Main unsuccessfully petitioned to open the November, 1993 default judgment. 213 B.R. at 75. On appeal, the Superior Court affirmed the denial of Main's petition with the caveat that "the right of [Arch] ... to execute against assets in the hands of Main, Inc. is limited to those assets owed to, owned, or controlled by Eric J. Blatstein." *718 Arch Street v. Blatstein,* 698 A.2d 117 (Pa.Super. Jan. 14, 1997).

Within days of Arch's garnishment, Blatstein instructed his controller, Kenneth Shoop, to deposit Main's receivables into an account maintained at Jefferson Bank in the name of Reedco, Inc. ("Reedco"), a corporation that Blatstein had formed in December, 1995, but which was not yet operating. 213 B.R. at 82. Pursuant to Blatstein's instruction, Shoop also directed credit card companies to deposit funds owed to Main into Reedco's account. 213 B.R. at 82. Both Blatstein and Shoop testified that the purpose of these transactions was to permit Main to pay its bills, continue operations, and prevent future garnishments by Arch. 213 B.R. at 82.

On April 16, 1996, Arch caused the Philadelphia Sheriff's Department to levy on Main's furniture, equipment, liquor license, and the entire contents of Philly Rock. 213 B.R. at 82. Shortly after the Sheriff's levy, Blatstein instructed Shoop to open a bank account in New Jersey in the name Chicken Fingers, Inc. ("CFI"), another recently formed Blatstein corporation, to avoid the Sheriff's levy and continue operations of Philly Rock. 213 B.R. at 82. From June 11, 1996 to mid-September, 1996, just days before Main's bankruptcy filing, all Main's receivables were deposited into the CFI account. 213 B.R. at 82–83.

On July 25, 1996, Lift purchased Main's assets at a public foreclosure sale conducted by auctioneer Barry S. Slosberg, Inc. ("Slosberg") and advertised in the *Philadelphia Inquirer.*[9] 213 B.R. at 79, 81. Lift, the sole

---

**9.** The Bankruptcy Court also found that effective July 1, 1996, weeks prior to the foreclosure, Blatstein had transferred all of Main's assets and employees to Columbusco. The Bankruptcy

Court explained that following the July 1, 1996 transfer:

Columbusco owned and operated Philly Rock and received all of the proceeds from its operation. All of Main's assets and employees were

bidder at the public auction, purchased Main's assets for $1.00. 213 B.R. at 79, 81. Slosberg's bill of sale reflects that Lift purchased all Philly Rock's furniture, fixtures, equipment and rock & roll memorabilia, subject to his own security interests and to the Sheriff's levy filed on behalf of Arch. 213 B.R. at 81. Nothing in the record suggests that the public foreclosure auction failed to comport in any respect with the requirements of Pennsylvania law or the U.C.C.

Following the foreclosure, Lift transferred Philly Rock's furniture, equipment and inventory, which he valued at $35,000, and its liquor license, which he valued at $23,000, to Columbusco. 213 B.R. at 79–80. Lift then sold Main's general intangible assets, including the "Philly Rock" name, to Columbusco for $1,000.00. 213 B.R. at 80. Philly Rock's operations were unaffected by either the July 1st transfer or by the July 25th foreclosure. 213 B.R. at 82.

## III. *THE PROCEEDINGS BELOW*

On September 20, 1996, Main filed a voluntary Chapter 11 bankruptcy which, in December, 1996, was converted to a Chapter 7. Mitchell W. Miller, Esquire was appointed Main's interim trustee. On December 19, 1996, Blatstein filed a voluntary individual Chapter 7 bankruptcy in which Michael H. Kaliner, Esquire, was appointed as interim trustee. Both Miller and Kaliner were permitted to intervene as plaintiffs in these proceedings.

In early January, 1997, Arch filed identical adversary proceedings in both the Main and Blatstein bankruptcies. Arch named as defendants in both proceedings Blatstein, Main, Lori Blatstein, Lift, and the non-debtor corporate defendants, including Delawareco, Inc., incorporated on March 9, 1992 (owns and operates the Maui nightclub); Engine 46 Steak House, Inc., incorporated on March 16, 1995 (operates a family restaurant); Reedco, Inc. ("Reedco"), incorporated on December

18, 1995 (owns the Margarita Café); Waterfront Management Corporation, incorporated on January 10, 1996, to serve as a management company for all of Blatstein's businesses; Columbusco, incorporated on May 2, 1996 which, effective July 1, 1996, assumed operation of Philly Rock; Airbev, Inc., incorporated on November 6, 1995 (operates three bars and a Philly Rock at Philadelphia International Airport); and Pier 53 North, Inc., incorporated on November 22, 1993 (owns the real property on which the Maui nightclub is located).

In these proceedings, Arch argued that: (1) Blatstein and Main fraudulently transferred to Columbusco Main's only asset—Philly Rock—in violation of the Pennsylvania Fraudulent Transfer Act, 12 Pa. Cons.Stat. §§ 5101 *et seq.*; (2) Blatstein should be denied his bankruptcy discharge under 11 U.S.C. § 727(a)(2) & (a)(7) as a result of his efforts to hinder and delay Arch's collection of its judgment against Main; (3) Blatstein's transfer of in excess of $1 million to his wife Lori should be set aside; and (4) under a corporate alter-ego theory, the non-debtor corporations should be held liable for Arch's judgment against Main and Blatstein.

On February 2, 1997, Arch filed a Proof of Claim against Blatstein totaling $3,398,-408.30, which included the $2,774,803.09 confessed judgment plus $623,605.29 in post-judgment interest, and a Proof of Claim against Main totaling $3,190,298.10, which included the $2,774,803.09 default judgment plus $415,495.09 in post-judgment interest. Both Blatstein and Main filed objections to Arch's Proofs of Claim, arguing that Arch's claim should be reduced pursuant to 11 U.S.C. § 502(b)(6), which limits a lessor's claim in bankruptcy for future (or "reserved") rent.

On April 15, 1997, the Bankruptcy Court held a hearing on Debtor's Objections to Arch's Proof of Claim, and shortly thereafter

---

transferred to Columbusco. Philly Rock never shut down for one minute and still operates under the aegis of Columbusco with the same employees, furniture, and equipment as it did when it was owned and operated by Main.
213 B.R. at 83. According to the Bankruptcy Court's determination, on July 25, 1996, Lift

foreclosed on the assets of a corporation that no longer possessed any assets. The Bankruptcy Court fails to explain how Lift was able to foreclose on Main's assets and transfer those assets to Columbusco, weeks *after* Blatstein had already caused those very same assets to be transferred from Main to Columbusco.

concluded that under § 502(b)(6), Arch's total claim should be reduced to $269,159. Arch appealed and on August 27, 1997, the District Court reversed in part and remanded to the Bankruptcy Court, concluding that while § 502(b)(6) should be applied to substantially reduce Arch's claim for future rent, the Bankruptcy Court had improperly utilized April 6, 1992 as the date of lease surrender for the purpose of capping the future rent claim. *In re Main, Inc.*, No. Civ. A. 97–3739, 1997 WL 560119 (E.D.Pa. Aug. 26, 1997) (Padova, J.). On remand, the Bankruptcy Court recalculated Arch's claim, utilizing June 1, 1993 as the date of lease surrender, to cap Arch's total claim at $582,443.65. *In re Main, Inc.*, 1997 WL 626544, *9 (Bankr. E.D.Pa. Oct. 7, 1997).

Shortly before trial of the adversary proceedings, the Bankruptcy Court permitted Arch to Amend its Complaint to add a fraudulent transfer claim under 11 U.S.C. § 548(a),[10] and to challenge Blatstein's bankruptcy discharge under § 727(a)(3). Trial began on May 1, 1997 and concluded on May 30, 1997. On September 8, 1997, following extensive post-trial briefings, Chief Judge Scholl issued an eighty-nine page opinion concluding that:

0) Main's July 1, 1996 conveyance of Philly Rock's assets to Columbusco, and Lift's subsequent foreclosure on those assets and retransfer to Columbusco, constituted fraudulent transfers under Pennsylvania law;

1) Because of Blatstein's efforts to prevent Arch's execution on Main's assets, including the transfer of the Philly Rock assets and his directions to deposit Main's receivables into bank accounts of corporate affiliates, his bankruptcy discharge would be denied under 11 U.S.C. § 727(a)(2)(A) & (a)(7);

2) Arch failed to meet its burden of proof under a corporate alter-ego theory that the non-debtor corporate defendants should be liable for Arch's judgments against Blatstein and Main;

3) Arch failed to establish that Blatstein's transfers of income and other funds to accounts maintained in the name of his wife Lori should be set aside as fraudulent transfers; and

4) Lift's entire proof of claim, in the amount $492,415.41, would be denied because his security interests and judicial liens in Main's assets were either invalid, obtained by collusion with Blatstein, or had been paid in full.

Defendants have appealed holdings (1), (2), and (5) of the Bankruptcy Court's September 8, 1997 Opinion and Order, while Arch has appealed holdings (3) and (4). Both Arch and Main have appealed the Bankruptcy Court's October 7, 1997 recalculation of the cap on Arch's future rent claim. For the following reasons, the September 8, 1996 decision of the Bankruptcy Court will be affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion. The Bankruptcy Court's October 7, 1997 decision will be affirmed in its entirety.

## IV. DISCUSSION

### The Standard of Review

"[I]n bankruptcy cases, the district court sits as an appellate court." *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir.1995). On appeal from bankruptcy court, the district court applies the standard of review set forth in Bankruptcy Rule 8013:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Fed.Bankr.R.Civ.P. 8013.

"[T]he district court ... is not authorized to engage in independent fact finding [and]

---

10. Under 11 U.S.C. § 548(a)(2)(A) "The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... received less than a *reasonably equivalent value* in exchange for such transfer or obligation...." 11 U.S.C. § 548(a)(2)(A) (1993) (emphasis added).

reviews the bankruptcy court's findings in a core proceeding only for clear error." *In re Indian Palms Assocs., Ltd.,* 61 F.3d 197, 210 n. 19 (3d Cir.1995) (citing Fed.R.Bankr.P. 8013). "Findings of fact by a trial court are clearly erroneous when, after reviewing the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed." *Cohn,* 54 F.3d at 1113 (citation omitted).

> [T]he clearly erroneous standard is fairly stringent: 'It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination is either completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'

*Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.,* 57 F.3d 1215, 1223 (3d Cir.1995) (quoting *Hoots v. Pennsylvania,* 703 F.2d 722, 725 (3d Cir.1983)). "Furthermore, in reviewing the bankruptcy court's factual findings [the district court must] give 'due regard' to the opportunity of that court to judge first-hand the credibility of witnesses." *Id.*

In contrast to questions of fact governed by the clearly erroneous standard, a *de novo* standard of review applies to questions of law, which requires this Court to reach its own legal conclusions "without deferential regard to those made by the bankruptcy court." *Fleet Consumer Discount Co. v. Graves (In re Graves),* 156 B.R. 949, 954 (E.D.Pa.1993), *aff'd,* 33 F.3d 242 (3d Cir. 1994). The Court will separate the factual and legal elements of mixed findings of fact and law and apply the appropriate standard to each component. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 103 (3d Cir.1981); *see also In re Trans World Airlines, Inc.,* 145 F.3d 124, 131 (3d Cir.1998) (noting that the district court reviews "the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof").

### A. The Bankruptcy Court Erred In Its Analysis Of The July, 1996 Foreclosure And Of The Objection To Lift's Proof Of Claim.

The Bankruptcy Court held that Lift's foreclosure on Main's assets and his subsequent transfer of those assets to Columbusco for less than adequate consideration constituted a "sham" transaction intended to prevent Arch from executing on its default judgment against Main. Based on that conclusion, the Bankruptcy Court declared Lift's foreclosure sale "collusive" and ordered the transfer of the Philly Rock assets set aside under Pennsylvania's Uniform Fraudulent Transfer Act ("UFTA" or the "Act"), 12 Pa. Cons.Stat. § 5101 *et seq.*[11] Under UFTA, a transfer may be deemed fraudulent as to creditors where it is made "with actual intent to hinder, delay or defraud any creditor of the debtor." 12 Pa. Cons.Stat. § 5104(a) (West Supp.1997).

The Bankruptcy Court further concluded that Blatstein's July 1, 1996 transfer of Main's assets to Columbusco, as well as the transfer of Main's receivables to Reedco and CFI, constituted fraudulent conveyances intended to thwart Arch's collection efforts. 213 B.R. at 78–83. According to the Bankruptcy Court, Blatstein's admission that these transfers were undertaken to prevent Arch from collecting its judgment against Main, standing alone, provides sufficient ground to invoke UFTA and set the transfers aside. 213 B.R. at 83 (citing *In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir.1986) (where debtor admits that he acted with actual intent to hinder or delay creditor, "there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had requisite intent")).

The Bankruptcy Court also sustained Plaintiffs' objection to Lift's Proof of Claim, noting that the debts supporting Lift's claim resulted from loans made to entities other than Main. 213 B.R. at 97. The Bankruptcy Court reasoned further that even if Lift were entitled to any claim on Main, his claim

---

**11.** A "collusive" transaction is defined generally as one involving "secret cooperation for a fraudulent or deceitful purpose." *In re New York Trap* *Rock Corp.,* 42 F.3d 747, 752 (2d Cir.1994) (quoting *Webster's Third New International Dictionary* 466 (G. & C. Merriam Co. 1976)).

would be "subordinated" due to his "insider" status and "inequitable conduct." 213 B.R. at 97–98.

The Bankruptcy Court supported these holdings with circumstantial evidence of Blatstein's intent to hinder and delay Arch, including evidence that: (1) Lift paid only $1.00 for Main's assets; (2) prior to July, 1996, Lift had never attempted to foreclose on Main's assets; (3) Main attempted to thwart Arch's collection efforts, while it made no effort to prevent Lift's foreclosure; (4) Lift entered a confessed judgment against Main on November 12, 1992, the same day on which Arch entered its confessed judgment against Archco; and (5) Lift was an "insider" of Main. 213 B.R. at 80–81, 97–98.

1) **The Bankruptcy Court Erred By Failing To Recognize That A Corporation May Grant A Valid Security Interest In Its Own Assets To Secure The Pre–Existing Debts Of A Corporate Affiliate.**

■ At the outset of its discussion, the Bankruptcy Court properly recognized that its "assessment of the status of Lift" was central to its proper analysis of the fraudulent conveyance issue. 213 B.R. at 79. A "transfer," for purposes of avoidance under UFTA, must dispose of or part with an "asset" or an "interest in an asset." 12 Pa. Cons.Stat. § 5101(b). The UFTA expressly excludes from its definition of an "asset" any property of the debtor "to the extent it is encumbered by a *valid lien*." *Id.* (emphasis added). *See also* 12 Pa. Cons.Stat. § 5101 cmt. 2 (explaining that the statutory definition of an "asset" excludes "an interest that is generally beyond reach by unsecured creditors because subject to a valid lien"); *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 262 (1st Cir.1997) (where secured loan exceeded fair value of secured assets, there could be no transfer for the purpose of fraudulent conveyance act); *Owen v. Vibrosearch Exploration, Inc.*, 694 S.W.2d 421, 425 (Tex.Ct.App.-Hous.1985) (unsecured creditor not defrauded, hindered or delayed where secured debt greatly exceeded value of assets

transferred). If Lift held valid security interests in the assets of Main senior to Arch's lien, and if Lift's combined liens exceeded the value of Main's assets, there would be no "asset" within the scope of UFTA's definition subject to a fraudulent transfer claim. Thus, the determination of the validity and priority of Lift's security interests in the assets of Main proves crucial to this dispute.

Although the Bankruptcy Court recognized the importance of ascertaining Lift's status as a potential secured creditor of Main, its ensuing discussion largely sidestepped the issue, instead focusing on Blatstein's own explanation of Main's transfers and the circumstances surrounding Lift's foreclosure, including the purportedly inadequate consideration and Lift's status as an "insider" of Main. When the Bankruptcy Court did address the status and computation of Lift's liens, *see* 213 B.R. at 96–98, it committed legal error that requires reversal and remand.

■ The Bankruptcy Code and the Uniform Commercial Code distinguish three varieties of liens: judicial liens, security interests, and statutory liens. Under § 9–301 of the Uniform Commercial Code, a "lien creditor has priority over a secured creditor only if the lien attaches before the security interest is perfected." *Trinity Holdings, Inc. v. The Firestone Bank*, Civ. A. No. 92–203, 1994 WL 449258, *8 (W.D.Pa. May 4, 1994). A security interest is a "lien created by an agreement." 11 U.S.C. § 101(51) (1993). Generally, an attached—*i.e.*, valid—security interest is perfected by the proper filing of a financing statement.[12] 13 Pa. Cons.Stat. §§ 9302 & 9303 (1984). Judicial creditors, however, are not always lien creditors. A "lien arises only after the judgment is enforced through the judicial process—by 'writ of execution, attachment, levies or the like.'" *Massachusetts Mut. Life Ins. Co. v. Central Penn Nat'l Bank*, 372 F.Supp. 1027, 1044 (E.D.Pa.1974) (quoting U.C.C. § 9–301(3)), *aff'd mem.*, 510 F.2d 970 (3d Cir.1975). Thus, if Lift obtained and perfected valid security interests in the assets of Main prior

---

12. Security interests in money or instruments must be perfected through possession. *See* 13

Pa. Cons.Stat. § 9304(a).

to Arch's becoming a lien creditor of Main (through attachment of the judgment in its favor), Arch's interests in the assets of Main are subordinate to those of Lift.

In light of these principles, Lift apparently obtained perfected security interests in Main's assets by the filing of U.C.C. financing statements in May and November of 1992. Although Arch obtained its default judgment against Main in November, 1993, it apparently did not become a lien creditor of Main until its garnishment action in February, 1996. *See* 13 Pa. Cons.Stat. § 9301(c) ("[A] 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like."). Until that date, Arch, relative to Lift's potentially perfected security interest, stood in the shoes of an unsecured creditor. After that date, Arch was a lien creditor, but inferior in priority to any prior perfected security interests. Accordingly, Lift's perfected security interests in Main's assets should, if valid, have priority over Arch's lien obtained following its default judgment against Main.

The question remains whether Lift's secured interests are valid. Filing perfects those security interests which are *attached.* *See* 13 Pa. Cons.Stat. § 9302(a) ("A security interest is perfected when it has attached [and when filing has taken place]."). The security interest itself must be enforceable against the debtor before perfection against third parties may take place. Under § 9203 of Pennsylvania's Commercial Code, a security interest attaches when: (1) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral; (2) value has been given; and (3) the debtor has rights in the collateral. 13 Pa. Cons.Stat. § 9203(a).

On February 26, 1997, Lift filed a secured proof of claim in the Main bankruptcy case for $492,415.41. At the hearing on his proof of claim, Lift presented documentary evidence reflecting that Main owed him: (1) $261,000 on the loans to Blatstein's old corporations; (2) $62,000 towards the Beratans' purchase of the loan from Marian; (3) $10,000 that the Beratans loaned to Main in August 1996; (4) $100,000 that he loaned to Reedco on Main's behalf in 1996; and (5) $43,000 which was taken from his certificates of deposit by Marian when Main defaulted on the old loans. These amounts total $476,000 which, as the Bankruptcy Court noted, fairly approximated Lift's original $492,415 proof of claim.[13]

Although the Bankruptcy Court did not find that any of these debts was invalid or insufficiently supported by the evidence, it did conclude that the obligations identified by Lift were not those of Main but of other Blatstein corporations, in particular Archco, Boulevardco, Inc., and Walnut Federal, Inc.:

> [I]n a letter from Marian sent to Lift regarding the redemption of the certificates of deposit, the bank officer stated that the monies therefrom were applied to the indebtedness of Archco, Boulevardco, and the Blatsteins individually, not to Main. Moreover, in a July 20, 1993, Assignment of Promissory Notes, Mortgage, Surety, Agreements, Security Agreements and Other Collateral executed between Marian and the Blatsteins, it was specifically stated that the Marian loans assigned to the Beratans in the amount of $391,162.67 *pertained to funds borrowed by Boulevardco, Archco, and the Blatsteins on behalf of Walnut.* Nowhere in any of the documents evidencing these loans is Main mentioned. Moreover, *we believe that the monies loaned by Marian were for the benefit of the now-defunct old corporations, not for Main's benefit as Lift testified.* Therefore, we will not obligate Main's bankruptcy estate to reimburse Lift on those loans.

213 B.R. at 97 (emphasis added).

█ Thus, while correctly focusing on the validity of Lift's security interests, the Bank-

---

13. In addressing Arch's alter-ego claim, the Bankruptcy Court found that loans made by Lift for the benefit of Blatstein and the defendant corporations, as "evidenced by check," totaled $530,758.86, and that the Beratans' loans evidenced by check totaled $790,200. 213 B.R. at 89–90. On remand, it would be helpful if the Bankruptcy Court prepared a single table reflecting all loans made by Lift and the Beratans, as established by canceled checks or other appropriate evidence, the date on which each such loan was made, the entity to which the loan was made, and the remaining balance on each loan.

ruptcy Court appears ·to have assumed that in order for a lender to obtain a valid security interest or lien in corporate assets, the entity granting the security interest must receive the benefit of the loan proceeds. The law, however, is well settled to the contrary. *See, e.g., In re Reliable Mfg. Corp.,* 703 F.2d 996, 1000 (7th Cir.1983) ("A security interest given in consideration for the obligation of a third party clearly ∴.. fulfills the requirements of the U.C.C. It is enough, in fact, that there be detriment to the secured party even if there is no benefit to the owner of the assets subject to the security interest."); *In re Terminal Moving & Storage Co.,* 631 F.2d 547, 551 (8th Cir.1980) (*en banc*) ("The fact that the benefit of this agreement accrued to . . . the sole stockholder of [the corporation] and not the corporation does not detract from the fact that the secured party gave value for the security interest. Since consideration sufficient to support a simple contract was present, value was given and the security interest attached."); *Pittsburgh Tube Co. v. Tri–Bend, Inc.,* 185 Mich.App. 581, 463 N.W.2d 161, 164 (Mich.App.1990) ("By its plain language, UCC 9–203(1) does not require that debtor receive anything in order for the security agreement to attach; it only requires that the secured party give value."); *Owen v. Vibrosearch Exploration, Inc.,* 694 S.W.2d 421, 424 (Tex.Ct.App.-Hous.1985) (holding that satisfaction of pre-existing debt of corporate affiliate was sufficient to support jury finding of fair consideration for the transfer of valid security interest).

Judge Van Antwerpen's opinion in *Adelvision, L.P. v. Groff,* 859 F.Supp. 797 (E.D.Pa. 1994), provides a good illustration of the principle set forth in the cases cited above. In *Adelvision,* Horace Groff obtained a multi-million dollar line of credit from Hamilton Bank for the use of his corporation, GPC. 859 F.Supp. at 800. To secure the loan, Hamilton obtained a security interest in GPC's assets and a mortgage on Groff's personal residence. *Id.* When the loan was executed, Groff also owned five limited partnership interests in Adelvision, a cable television company. *Id.* Hamilton's security interest *did not* extend to these partnership interests. *Id.*

Following GPC's default in the early 1990's, Hamilton accepted the offer of a third party, David Cook, to purchase the loan for $1.5 million, which was approximately half the outstanding balance. *Id.* In consideration for Cook's purchase of the Hamilton loan, and expecting that Cook would permit him to continue to operate GPC, Groff granted Cook a security interest in the Adelvision partnership interests securing the entire loan balance. *Id.*

In 1992 Adelvision was sold to a third party and Groff received $794,382 in cash for his partnership interests. *Id.* at 801. The IRS asserted a number of tax liens against the proceeds which, with a single exception, were filed **after** Cook received his security interest in the Adelvision interests. *Id.* With respect to the junior tax liens, the IRS argued that Cook had not "given value" under § 9203—and thus his security interest never attached—because: (1) Cook incurred no detriment when he purchased the Hamilton loan; and (2) the Adelvision limited partnership interests received no benefit from Cook's purchase of the loan. *Id.* at 805–06.

In rejecting the IRS' argument, the district court began with the U.C.C.'s definition of "value." *Id.* at 804. A person gives "value" for a security interest if he acquires the right:

(1) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a chargeback is provided for in the event of difficulties in collection;

(2) as security for or in total or partial satisfaction of a preexisting claim;

(3) by accepting delivery pursuant to a preexisting contract for purchase; or

(4) generally, in return for any consideration sufficient to support a simple contract.

13 Pa. Cons.Stat. § 1201.

Focusing on (4) above, the *Adelvision* court noted that under Pennsylvania law, " '[v]alid consideration confers a benefit upon the promisor *or* causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in

exchange for the original promise.'" 859 F.Supp. at 804 (emphasis added) (quoting *Cardamone v. University of Pittsburgh,* 253 Pa.Super. 65, 384 A.2d 1228, 1232 n. 6 (Pa.Super.1978)). The *Adelvision* court explained:

> Such benefit and detriment, however, are only loosely defined. Detriment to the promisee is sufficient in the legal sense if at the request of the promisor and upon the strength of that promise, the promisee performs any act which causes the promisee the slightest trouble or inconvenience, and which the promisee is not otherwise obliged to perform. Moreover, the Pennsylvania courts have long held that the adequacy of consideration is not a factor to be considered in determining the validity and enforceability of a contract. *Washowich v. McKeesport Municipal Water Authority,* 94 Pa. Cmwlth. 509, 515, 503 A.2d 1084, 1087 (1986); *Kelly by Kelly v. Ickes,* 427 Pa.Super. 542, 629 A.2d 1002 (1993); *Dahar v. Grzandziel,* 410 Pa.Super. 85, 599 A.2d 217 (1991).

*Id.* at 804–05 (internal citation omitted).

The *Adelvision* court concluded that Cook's purchase of the Hamilton loan constituted a sufficient legal detriment to support consideration under Pennsylvania law.[14] *Id.* at 806. In rejecting the IRS's argument that the partnership interests received no benefit from Cook's purchase of the Hamilton loan, the district court found that it "need not inquire as to the benefit received by the promisor in order to find valid consideration." 859 F.Supp. at 805. The *Adelvision* court explained by quoting the Pennsylvania Supreme Court:

> 'There may be a consideration without the accrual of any benefit at all to the promisor. If the promisee has suffered any detriment however slight, or though he has suffered no real detriment, if he has done what he was not otherwise bound to do, in return for the promise, he has given a consideration and the court will not ask whether the promisor was benefitted.'

*Id.* at 805–06 (quoting *Hillcrest Foundation, Inc. v. McFeaters,* 332 Pa. 497, 2 A.2d 775, 778 (Pa.1938)). Accordingly, the district court held that because Cook suffered a "legal detriment" by his purchase of the Hamilton loan, it need not inquire whether the Adelvision partnership interests received any benefit. *Id.* at 806. Consequently, the district court concluded, "Cook's security interest was protected under Pennsylvania law against subsequent judgment lien creditors," including the IRS. *Id.*

■ Here, whether Lift obtained valid security interests in Main's assets depends not on whether Main received the benefit, directly or indirectly, of the Lift/Beratan loans, but on whether Lift "gave value," or "suffered any detriment" in exchange for his security interests. Under *Adelvision* and the authorities cited above, by loaning money to corporate affiliates and predecessors of Main, Lift gave sufficient value to obtain a valid security interest in Main's assets. If valid security agreements existed (possibly the financing statements themselves), and if Main had rights in the collateral hypothecated, Lift's security interests were attached. Presumably, these attached security interests would have been perfected by his filing of U.C.C. financing statements.[15] The Bankruptcy Court focused only on whether Lift or the Beratans could prove that they made loans to Main, ignoring the greater question of whether Lift gave "value." The issue was not whether Main *received* value, but rather

---

14. The IRS also contended that because Cook was going to make a substantial profit on his purchase of the Hamilton loan, he suffered no detriment sufficient to support consideration. Quoting Professor Williston, the district court rejected this argument: "It is an 'elementary principle that the law will not enter into an inquiry as to the adequacy of consideration.' The rule is almost as old as the law of consideration itself." 859 F.Supp. at 805 (quoting *Williston on Contracts* § 115 (internal quotations omitted)).

15. The granting of a security interest itself in the assets of the debtor is a transfer subject to avoidance under the Bankruptcy Code. It appears, and must be assured on remand, that Lift had solidified his secured interests in Main by November, 1992 at the latest. This date being just less than four years prior to the filing of Main's bankruptcy petition, Main's transfer of a security interest to Lift would not be subject to the avoidance provisions of either § 547 or § 548 of the Bankruptcy Code.

whether Lift, the creditor claiming secured status, gave consideration in return for his security.

The Court does not now hold that Lift's security interests in and judicial liens on Main's assets are valid, which is an issue that must be left for the Bankruptcy Court to decide on remand. Lift's security interests could be found invalid, for example, if they were based on wholly fictitious obligations. The Bankruptcy Court must also determine the extent to which Lift's claims, if valid, have been reduced through repayment by Main and the other corporate entities. *See* 213 B.R. at 90. The Court does conclude, however, as a matter of law, that the Bankruptcy Court erred in failing to recognize that a corporate lender in Lift's position could obtain a valid security interest in Main's assets securing loans made for the benefit of Blatstein's old corporations and Main's corporate affiliates.

The Bankruptcy Court should also consider on remand whether Lift's security interests, if valid, extend to "future advances" within the scope of 13 Pa. Cons.Stat. § 9204(c). *See* 13 Pa. Cons.Stat. § 9204(c) ("Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment (section 9105(a))."); *see also Kitmitto v. First Pa. Bank, N.A.*, 518 F.Supp. 297, 299 (E.D.Pa. 1981) ("Security agreements covering future advances are valid under Pennsylvania law. Whether a particular security agreement covers such advances depends on the intent of the parties." (citations omitted)). For example, Lift's $100,000 loan to Reedco, which the Bankruptcy Court held to be for the benefit of Main, might very well fall within the scope of a future advance provision. *See* 13 Pa. Cons.Stat. § 204, cmt. 5 ("There is no need to refer to after-acquired property or future advances in the financing statement."). *But see* 13 Pa. Cons.Stat. § 9301(d) ("A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within 45 days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.").

In declaring Lift's foreclosure upon and subsequent conveyance of Main's assets to Columbusco fraudulent under UFTA, the Bankruptcy Court devoted much discussion to the eleven "badges of fraud" set forth in § 5104(b) of UFTA and their overlapping counterparts utilized to interpret § 548(a)(1) of the Bankruptcy Code. As the Bankruptcy Court properly recognized, UFTA's eleven factors may be considered in evaluating whether a transfer was made with "actual intent to defraud" for the purpose of § 5104(a) of UFTA. 213 B.R. at 78. As explained above, however, under UFTA there is no transfer subject to possible avoidance where the "asset" "transferred" is encumbered by a valid prior lien. Accordingly, without a proper analysis and valuation of Lift's security interests in Main's assets, it is impossible to determine whether UFTA or its badges of fraud apply. The Court makes no determination of these factors.

### 2) The Bankruptcy Court Erred In Holding That Lift's Foreclosure Could Be Found Collusive Even If His Security Interests In Main's Assets Were Valid.

The Bankruptcy Court appears to have rested its holding on an alternative ground. In setting aside the transfer of Main's assets under § 5104, the Bankruptcy Court concluded that "Lift's secured status, *even if legitimate*, does not insulate the Defendants from a claim of fraudulent conveyance if the foreclosure transaction is found to be collusive." 213 B.R. at 79 (emphasis added) (citing *Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir.1990)). Although its legal reasoning is not entirely clear, it appears that the Bankruptcy Court turned its analysis to the fraudulent conveyance provisions of the Bankruptcy Code. 213 B.R. at 80.

Dealing with these issues, the United States Supreme Court held, in *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), that "reasonably equivalent value" in the context of a foreclosure sale means "the price in fact received at the foreclosure sale, so long as all

the requirements of the State's foreclosure law have been complied with." 511 U.S. at 544, 114 S.Ct. 1757. Here, nothing in the record suggests that the foreclosure sale in issue failed to comport with the requirements of Pennsylvania law. The *BFP* Court recognized, as did the Bankruptcy Court, that a "collusive" foreclosure sale may still be set aside under § 548(a)(1). 511 U.S. at 545, 114 S.Ct. 1757. It is unlikely, however, that after *BFP*, a finding of collusion would be appropriate in the absence of some form of bid rigging or auction fraud. *See, e.g., Miner v. Bay Bank & Trust Co.*, 185 B.R. 362, 367 (N.D.Fla.1995) ("It appears that a foreclosure sale properly conducted in accordance with state law is, by definition, 'noncollusive.'"); *In re Theoclis*, 213 B.R. 880, 882 (Bankr.D.Mass.1997) ("[U]nless the Debtor is able to point out an irregularity with the sale, insufficiency of price alone is simply not enough to invalidate the sale."). Following *BFP*, "the appropriate focus of an inquiry into collusion must be on the sale itself, as opposed to events leading up to the commencement of the foreclosure." *In re Bennett*, 154 B.R. 140, 147 (Bankr.N.D.N.Y. 1992). Thus, for purposes of the "collusive" exception to *BFP*, "the effect of the collusion must be evident in the price received for the property and, accordingly, must manifest itself in **bid rigging or some other form of price fixing**." *Id.* (emphasis added).[16] Nothing in the record below suggests either that bidding was suppressed, rigged, or fraudulent at the foreclosure sale or that the foreclosure otherwise failed to comport in full with the requirements of Pennsylvania law.

The Bankruptcy Court cited *Voest–Alpine*, a Third Circuit decision in which a "sham foreclosure" was "set aside." 213 B.R. at 79. In that decision, however, the court referenced clear and uncontradicted findings of fact indicating collusive agreements and "efforts to conceal" the foreclosure in question. *See Voest–Alpine*, 919 F.2d at 212. The evidence of subterfuge before the court "was abundant," including uncontested evidence that the creditor's foreclosure was at the request of a third party, made possible only through side agreements. *Id.*

Moreover, the *Voest–Alpine* court held that unsecured creditors of the debtor corporation were prejudiced by a foreclosure sale of inventory and equipment at which less than fair market value was obtained:

> The third requirement for finding a fraudulent conveyance is that creditors have been prejudiced by the transaction in question. It seems clear to us that the depletion of Paige's assets obviously hurt all of Paige's unsecured creditors, and VATCO was the largest among them, holding about 55% of Paige's unsecured debt. VATCO here makes a persuasive case that, if Vantage had paid fair consideration to Paige, there would have been up to $400,000 left over for the unsecured creditors of Paige.

919 F.2d at 214. Here, the question of whether Arch was prejudiced by Lift's foreclosure cannot be answered without first properly evaluating whether Lift's security interests in Main's assets, if valid, exceeded the value of Philly Rock's assets. *See Richman v. Leiser*, 18 Mass.App.Ct. 308, 465 N.E.2d 796, 798 (1984) ("A conveyance is not established as a fraudulent conveyance upon showing of a fraudulent intention alone; there must also be a resulting diminution in the assets of the debtor available to creditors."). If Lift was undersecured, Arch cannot have been injured through Lift's foreclosure, for unless he paid more for the assets than they were worth, his claim still would be left partially unsatisfied, and nothing would remain for the next-in-line creditors.

In proceeding with its analysis under UFTA, the Bankruptcy Court referred repeatedly to the fact that "Lift only paid $1.00 for Main's assets, which were worth [at least] $35,000, even according to Lift and the other Defendants," and which generated over $3 million annually in revenue. 213 B.R. at 79–80.[17] The Bankruptcy Court also noted that

---

**16.** In holding that the amount received at a "regularly conducted" and "noncollusive" foreclosure sale should be deemed to be reasonably equivalent value as a matter of law, the *In re Bennett* court applied the test stated in *In re Madrid*, 21 B.R. 424 (9th Cir. BAP 1982), which was expressly adopted by the Supreme Court in *BFP*.

**17.** The Court does not consider Main's $3 million annual sales figure, standing alone, to be disposi-

"while Columbusco only paid $1,000 [to] Main for the purchase of the assets of and the name 'Philly Rock,' Columbusco is repaying loans received by Lift for the use of Blatstein from the Beratans despite the fact that neither Columbusco nor Main ever received any of these loan funds." 213 B.R. at 80. In light of these facts, the Bankruptcy Court concluded "that Lift did not pay full consideration for Main's assets." 213 B.R. at 80. According to the Bankruptcy Court, such alleged failure to pay full consideration is a factor "establish[ing] that the foreclosure sale of Main's assets held by Lift was a collusive sale, the ultimate effect of which was to prevent Arch from executing on its state court judgment and levy against Main's assets." 213 B.R. at 81.

■ The evidence upon which the Bankruptcy Court rested its determination that Lift's foreclosure was collusive appears largely circumstantial. The Court questions whether Lift's prior reluctance to foreclose on Main's assets should serve as evidence of fraudulent intent. The law should not penalize creditors who, while having a legal right to foreclose, refrain from doing so to permit a debtor to attempt to resolve his financial difficulties and keep his business operating. In declaring Lift's foreclosure sale collusive, the Bankruptcy Court also emphasized the timing of Lift's confessed judgments against Main, and in particular, the fact that Lift's November 12, 1992 confessed judgment was entered on the same day that Arch entered its confessed judgment against Archco and Blatstein. This timing was viewed by the Bankruptcy Court as proof that Blatstein and Lift were collaborating to enter a "defensive" confessed judgment intended to thwart Arch's collection efforts. Although Lift testified that he "did not find out about Arch's claims until Main's bank accounts were garnished in February 1996," the Bankruptcy Court rejected that testimony:

> We find that Lift's claims of innocence are not credible. We do not think it is a mere coincidence that Lift filed his UCC financing statement and obtained a confession of judgment against Main on the same day

that Arch obtained its confessed judgment. This is yet additional proof of the collusive and sham nature of Lift's actions as they relate to the debts he was allegedly owed by Main.

213 B.R. at 81.

The Bankruptcy Court thus not only found Lift's testimony incredible, but used its opinion that a coincidence did not exist as *evidence* of collusion. The Court disagrees with the Bankruptcy Court's logic, particularly because it carries the implication of fraud and perjury. The Court notes that on November 12, 1992, Main had no relationship with Archco. Thus, a defensive filing by Lift against Main would not serve any logical purpose. The Bankruptcy Court also failed to note that Lift obtained confessions of judgment and filed U.C.C. financing statements in May, 1992, several months prior to the November "coincidence." Moreover, if Blatstein were truly concerned about Main's potential liability on a judgment that Arch confessed against Archco and himself, it appears highly unlikely that he would have permitted Main to ignore Arch's interrogatories in aid of execution and then fail to appear at the assessment of damages hearing, thus triggering the $2.7 million default judgment against Main. In conclusion, the Court holds that the circumstantial evidence relied upon by the Bankruptcy Court fails to support its finding of a collusive foreclosure, and this finding constituted clear error.

### 3) The Bankruptcy Court Erred In Utilizing 11 U.S.C. § 510(c) To Subordinate Lift's Security Interests.

■ The Bankruptcy Court concluded that even if "Lift was entitled to any claim, we would nevertheless be inclined to subordinate any such claim to those of not only Arch, but all other 'innocent' creditors of Main." 213 B.R. at 97–98. According to the Bankruptcy Court, as an "insider" of Main, Lift's claim is subject to "careful scrutiny." 213 B.R. at 98 (citing *In re Lani Bird, Inc.*, 129 B.R. 203, 206 (Bankr.D.Hawai'i 1991); *In re Comtec Ind., Inc.*, 91 B.R. 344, 347–49 (Bankr.E.D.Pa.1988)). "Insider status,

---

tive. A business with annual sales of $3 million could be very profitable or very unprofitable, and

hence valuable or worthless, depending on its costs and other accounting issues.

alone, however, is insufficient to warrant subordination." *In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 657 (E.D.Pa.1995) (citing *In re Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir.1991)).

■ Under § 510(c)(1) of the Bankruptcy Code, existing priorities among creditors may be reordered "under principles of equitable subordination." 11 U.S.C. § 510(c)(1) (1993); *Burden v. United States*, 917 F.2d 115, 117 (3d Cir.1990) (citing *In re Virtual Network Servs. Corp.*, 902 F.2d 1246, 1247 (7th Cir.1990)); *In re Merwede*, 84 B.R. 11, 11 (Bankr.D.Conn.1988). The purpose of the equitable subordination doctrine is to see that " 'injustice and unfairness is not done in the administration of the bankrupt estate.' " *In re Nutri/System*, 178 B.R. at 656 (quoting *Pepper v. Litton*, 308 U.S. 295, 307–08, 60 S.Ct. 238, 84 L.Ed. 281 (1939)).

■ Nonetheless, "the relief of subordination 'should be applied only in limited circumstances.' " *In re Big Wheel Holding Co.*, 214 B.R. 945, 951 (D.Del.1997) (quoting *In re Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir.1991)). *See also In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir.1997) ("Equitable subordination is remedial in nature and is only rarely granted."); *In re M. Paolella & Sons, Inc.*, 161 B.R. 107, 117 (E.D.Pa.1993) ("[E]quitable Subordination is an extraordinary departure from the 'usual principles of equality of distribution and preference for secured creditors.' " (quoting *In re Osborne*, 42 B.R. 988, 992 (W.D.Wis.1984))). "[A] party seeking equitable subordination of a creditor's claim usually has the burden of proof. A proof of claim executed and filed in accordance with the Bankruptcy Code constitutes a *prima facie* valid claim." *In re Papercraft Corp.*, 211 B.R. 813, 823 (W.D.Pa.1997).

The Bankruptcy Court held that Lift's security interests in Main's assets should be subordinated to the claims of all other creditors because he

> was an active participant in the fraudulent conveyance of all or most of Main's assets to, ultimately, Columbusco. This conduct is clearly inequitable conduct which greatly unfairly disadvantaged Main's creditors. The ends of the Code, specifically the policy expressed in 11 U.S.C. § 548(a)(1), are served by subordinating the claims of a party engaging in such activity.

213 B.R. at 98.[18]

■ But if Lift's claims were valid—as the Bankruptcy Court *presumes* for the purpose of its analysis under § 510(c), 213 B.R. at 97–98,—then Lift's foreclosure on Main's assets would not have been fraudulent and none of Main's creditors would have been any more disadvantaged than any junior creditor facing a senior undersecured lienholder. Equitable subordination does not grant unlimited license to Bankruptcy judges to rearrange priorities established by state law. *See United States v. Noland*, 517 U.S. 535, 539, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (although a court of equity, a bankruptcy court " 'is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable' " (citation omitted)). As explained above, having erred in analyzing Lift's security interests in Main's assets—the critical first step—the Bankruptcy Court's subsequent analysis of Lift's foreclosure was premised on error, and must be revisited on remand. Likewise, the Bankruptcy Court's application of § 510(c) to subordinate Lift's senior security interests in Main's assets will be reversed and remanded for further consideration consistent with this Opinion.

### 4) On Remand, The Bankruptcy Court Should Address The Superior Court's Possible Limitation On The Right Of

---

18. The Third Circuit has suggested that inequitable conduct is not a prerequisite to equitable subordination. *See Burden v. United States*, 917 F.2d 115, 120–21 (3d Cir.1990) (finding creditor misconduct not necessary for equitable subordination of non-pecuniary loss tax penalties). The Bankruptcy Court rested its determination, however, on a finding that Lift had acted inequitably.

As explained, the validity of Lift's security interests must be evaluated before an analysis of the fairness of his conduct can begin. Since the fairness of Lift's conduct appears to have been the crucial factor in the Bankruptcy Court's decision that his claim could be equitably subordinated, this issue must be revisited on remand.

**Arch To Collect Its Confessed Judgment From Main's Assets.**

There remains another issue to be considered on remand. The Court of Common Pleas denied Main's petition to open Arch's default judgment. On appeal, the Superior Court affirmed, but with the caveat that "the right of [Arch] ... to execute against assets in the hand of Main, Inc. is limited to those assets owed to, owned, or controlled by Eric J. Blatstein." *718 Arch Street Assocs.*, No. 1849, slip op. at 5–6, 698 A.2d 117 (Pa.Super. Jan. 14, 1997). The Bankruptcy Court found that Main is owned by Blatstein and his wife as tenants by the entireties—not by Eric J. Blatstein individually. The Bankruptcy Court also found that while it was "unclear just how much money Blastein owes Main on his loan account balance," evidence of record suggested that the figure could be in excess of $400,000. 213 B.R. at 92. Based on this evidence, it appears that Main does not owe Blatstein anything.

After careful review of the District Court's opinion and the opinions issued by the Bankruptcy Court in these proceedings, the Court has not found any analysis of the impact of the Superior Court's apparent limitation on Arch's claim against Main. The Superior Court appears to suggest that Main's liability to Arch is simply that of a garnishee, *i.e.* it is liable only to the extent that funds in its possession are owed to or controlled by Blatstein individually. Again, it appears that Main owes nothing to Blatstein and does not possess funds under individual control by Blatstein. On remand, the Bankruptcy Court should consider the impact of the Superior Court's decision on the extent of Arch's claim against Main.

**A. On Remand The Bankruptcy Court Must Reconsider The Denial Of Blatstein's Bankruptcy Discharge.**

The Bankruptcy Code's discharge provision (11 U.S.C. § 727) is at "the heart of the fresh start provisions of the bankruptcy law," H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977), and must be construed liberally in the debtor's favor. *See, e.g., In re Burgess,* 955 F.2d 134, 137 (1st Cir.1992). "Completely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly." *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993).

The Bankruptcy Court concluded that "Blatstein's bankruptcy discharge must be denied pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(7) on account of his orchestration of the actual fraudulent transfer of debtor Main's assets within one year of the bankruptcy filings." 213 B.R. at 85. As held above, however, whether Blatstein did indeed orchestrate any fraudulent transfers cannot be answered without first ascertaining the status of Lift's security interests in and judicial liens on the assets of Main. Accordingly, the Bankruptcy Court's denial of Blatstein's discharge is vacated and remanded, subject to reconsideration of the fraudulent transfer issue consistent with this Opinion.

**B. The Court Agrees That Arch Has Failed To Meet Its Burden Of Proving That The Non–Debtor Corporate Defendants Are Alter–Egos Of Blatstein And Main.**

A corporation is a legal entity separate and distinct from its shareholders; thus only the corporation, not its owners, are liable for the corporation's debts. *See United States v. Sain,* 141 F.3d 463, 474 (3d Cir.1998). Based on this doctrine "large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944). Under Pennsylvania law, there is a strong presumption against piercing the corporate veil. *Lumax Indus., Inc. v. Aultman,* 543 Pa. 38, 669 A.2d 893, 895 (Pa.1995). A corporation is regarded as an independent entity even if its stock is owned entirely by one person. *See College Watercolor Group, Inc. v. William H. Newbauer, Inc.,* 468 Pa. 103, 360 A.2d 200, 207 (Pa.1976).

The legal status of a corporation may be disregarded only where " 'the corporation was an artifice and sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries.' " *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1521 (3d Cir.1994) (quot-

ing *Wheeling–Pittsburgh Steel Corp. v. Inter-steel, Inc.*, 758 F.Supp. 1054, 1058 (W.D.Pa. 1990)). A finding of alter-ego liability is a factual determination that must be supported by the record. *See Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.*, 727 F.2d 279, 283 (3d Cir.1983). As the party seeking "piercing," Arch has the burden of proof in establishing the alter-ego liability of the non-debtor corporate defendants. *See Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir.1979); *Reverse Vending Assocs. v. Tomra Sys. US, Inc.*, 655 F.Supp. 1122, 1128 (E.D.Pa.1987).

█ In determining whether to pierce the corporate veil, a court should consider the following factors: whether the corporation is grossly undercapitalized for its intended purpose; whether corporate formalities were followed; whether dividends were paid; whether the corporation is insolvent; whether the dominant shareholder has siphoned funds; whether there exist other officers; and whether the corporation is merely a facade for the operations of the dominant stockholder. *See Solomon v. Klein*, 770 F.2d 352, 353–54 (3d Cir.1985); *American Bell, Inc. v. Federation of Tel. Workers*, 736 F.2d 879, 886 (3d Cir.1984).

█ Arch premises its alter-ego theory on evidence that the corporate defendants frequently assumed each other's loan obligations, loaned money to each other without interest, and paid Blatstein's personal expenses. Arch's own expert conceded, however, that the corporate loans to Blatstein were declared on his personal income tax return, and that the corporations treated these loans as income to Blatstein. Arch's expert also acknowledged that banks frequently require that related corporations guarantee loans and other financial transactions, and that here, Jefferson Bank in fact required the corporate defendants to cover each other's overdrafts.

The Bankruptcy Court found that the corporate defendants maintained separate books and bank accounts and filed separate tax returns. Moreover, Defendants' expert testified that while the corporate defendants recorded combined gross revenues in 1996 of $31,000,000, inter-company transactions totaled $1,216,000, or only 3.89% of combined corporate revenues. In fact, rather than using the corporate entities to shelter funds otherwise available to his creditors, Blatstein was a net debtor to his corporations, owing Main in excess of $400,000.

The Bankruptcy Court also noted that it is neither illegal nor improper for closely-held corporations to grant non-interest bearing loans to their officers, or to pay personal expenses, provided that such transactions are properly documented. In light of the evidence of record, the Bankruptcy Court properly refused to declare the non-debtor corporate defendants alter-egos of Blatstein and Main.

**C. The Court Agrees That Arch Has Failed To Meet Its Burden Of Proving That Blatstein Fraudulently Transferred Assets And Income To His Wife.**

█ Pennsylvania subscribes to the majority view that property held as tenants by the entireties is unavailable to satisfy claims of the creditor of only one of the tenants. *See Sterrett v. Sterrett*, 401 Pa. 583, 166 A.2d 1, 2 (Pa.1960); *Patwardhan v. Brabant*, 294 Pa.Super. 129, 439 A.2d 784, 785 (Pa.Super.1982). As the Bankruptcy Court noted, "Pennsylvania law provides that when property is titled in the names of a husband and/or wife, without more, it is presumed that the property is owned by them as tenants by the entireties, even if the funds for the purchase of the property came from one spouse alone." 213 B.R. at 93 (citing *In re Estate of Holmes*, 414 Pa. 403, 200 A.2d 745, 747 (Pa.1964)).

Arch alleged that the Blatsteins' ownership of the stock of the corporate defendants as tenants by the entireties constituted a fraudulent conveyance. As the Bankruptcy Court pointed out, however, the corporate defendants' articles of incorporation, as well as the stock certificates, establish that corporate ownership had been by the entireties since the formation of each of the corporate defendants. The Bankruptcy Court found no evidence that the ownership of any of the

corporate defendants had ever been anything other than by the entireties.

■ Arch further contended that Blatstein's transfer of income and other money into accounts maintained in his wife's name alone should be set aside under 12 Pa. Cons. Stat. § 5104. At trial, Lori Blatstein confirmed that their brokerage and bank accounts were held in her name alone. Ms. Blatstein explained, however, that this practice was not intended to defraud creditors, but arose from the fact that, as a result of numerous overdrafts, banks refused to permit Blatstein to open accounts. The practice also arose from Blatstein's tax liens. Ms. Blatstein testified that her accounts were used to pay their mortgage, pay bills and tax liabilities of the corporate defendants, and to set money aside for their childrens' college educations. In light of this evidence, the Bankruptcy Court properly found "insufficient proof that this was done to keep creditors such as Arch from attaching the accounts." 213 B.R. at 94.

Moreover, the Bankruptcy Court concluded, it was "impossible, on th[e] record, to find that 'reasonably equivalent value' was not given to Blatstein and the corporations in exchange for their deposits into these accounts," pointing out that "Lori is and was at all pertinent times the rightful half-owner of all of the corporations in which Blatstein had an interest." The Bankruptcy Court explained:

> The funds that Blatstein was paid from the corporations as salaries were not the same as paychecks from a third-party employer. Rather, these payments could be viewed as distributions of dividends or equity from the corporations owned by both him and Lori to them both as the sole owners of the corporations.

1997 WL 626544 at * 5.

In light of the foregoing evidence of record, the Court affirms the Bankruptcy Court's refusal to set aside Blatstein's deposit of income and other funds in the accounts maintained in his wife's name.

**D. The Bankruptcy Court Properly Utilized June 1, 1993 As The Date Of Repossession Or Surrender For The Purpose Of Calculating The Cap On Arch's Future Rent Claim.**

■ Under § 502(b)(6) of the Bankruptcy Code, a lessor's claim for "damages resulting from the termination of a lease of real property" must be disallowed to the extent that such claim exceeds:

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus .

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6).

In its April 23, 1997 decision, the Bankruptcy Court utilized § 502(b)(6) to reduce Arch's claim from in excess of $3 million to $269,159. In performing the § 502(b)(6) calculation, the Bankruptcy Court assumed without discussion that April 6, 1992—the date on which Blatstein was prevented from emptying the contents of the nightclub and Arch padlocked the premises—should be deemed the date of repossession or surrender.

On appeal, the District Court concluded that although the § 502(b)(6) cap was applicable, April 6, 1992 could not be the correct date because: (1) the concepts of repossession and surrender as utilized in § 502(b)(6) must be construed in accordance with state law; (2) under Pennsylvania law, liability for future (or reserved) rent is terminated by the lessor's repossession of the property; and (3) in refusing to open Arch's confessed judgment against Blatstein, the Superior Court affirmed Blatstein's liability through the end of the lease term. Accordingly, the District Court concluded, the Superior Court *must* have concluded that the premises were not surrendered on April 6, 1992. That decision

will not be reconsidered. *See TCF Film Corp. v. Gourley,* 240 F.2d 711, 713 (3d Cir. 1957) (holding that the rule preventing one judge of a district court from overruling a decision by another judge of the same court, except under "exceptional circumstances," should be followed in the Third Circuit).

The District Court remanded the issue to the Bankruptcy Court to determine the date of repossession or surrender of the premises in accordance with state law, and to recalculate the § 502(b)(6) reduction of Arch's claim utilizing the correct date. In its October 7, 1997 opinion, the Bankruptcy Court concluded that repossession or surrender should be measured from June 1, 1993—the date on which Arch leased the property to a new tenant.

■■■ Under Pennsylvania law, a lessor "can eject the tenant and at the same time enter judgment for the rent accrued when the tenant was evicted; but he cannot recover both the possession and the rent for the balance of the term." *Homart Dev. Corp. v. Sgrenci,* 443 Pa.Super. 538, 662 A.2d 1092, 1100 (Pa.Super.1995) (internal citation omitted). As explained in *Homart,* "[t]he distinction must always be made 'between a possession of vacated premises taken by the landlord merely to protect the property or minimize the damages that would follow abandonment, and possession which would be adverse to any redemption of occupation by the tenant and thus amount to an eviction.'" *Homart,* 662 A.2d at 1101 (quoting *Hochman v. Kuebler,* 53 Pa.Super. 481, 487).

By leasing the premises to Illusions, Arch took action "adverse to any redemption of occupation" by Blatstein. Accordingly, the Court affirms the Bankruptcy Court's utilization of June 1, 1993 as the date of repossession or surrender for the purpose of applying the § 502(b)(6) cap on Arch's claim for future rent.

## V. CONCLUSION

For the foregoing reasons, the September 8, 1997 Opinion and Order of the Bankruptcy Court, holding that the assets of Main, Inc. were conveyed to Columbusco, Inc. in violation of Pennsylvania's Uniform Fraudulent Transfer Act, 12 Pa. Cons.Stat. § 5104, is **REVERSED** and remanded for further proceedings consistent with this Opinion. The Bankruptcy Court's denial of a bankruptcy discharge to Eric J. Blatstein pursuant to 11 U.S.C. § 727(a)(2)(A) is **REVERSED** and remanded for further consideration consistent with this Opinion. All other aspects of the Bankruptcy Court's September 8, 1997 and October 7, 1997 Opinions and Orders are **AFFIRMED.** An appropriate Order follows.

### ORDER

**AND NOW,** this 23rd day of September, 1998, upon consideration of the briefs filed in support of cross-appeals in this matter, and having heard oral argument, it is **ORDERED** that:

1. The Bankruptcy Court's decision is **AFFIRMED** in part and **REVERSED** in part.

2. The case is **REMANDED** to the Bankruptcy Court for further proceedings consistent with the Court's Opinion of this date.

It is further **ORDERED** that Plaintiff Miller's Motions to Amend Stay Order Pending Appeal (97–CV–7064 & 97–CV–7069) and Debtor Main's Motion to Amend Stay Order Pending Appeal (97–CV–7066) are **DISMISSED** as moot.