

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-3-1999

# In Re: Blatstein

Precedential or Non-Precedential:

Docket 98-1972, 97-CV-07066, 97-CV-07063, 97-CV-07069, 97-CV-07064, 97-CV-07070

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"In Re: Blatstein" (1999). *1999 Decisions.* Paper 248.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/248

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 3, 1999

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 98-1972

IN RE: ERIC J. BLATSTEIN; MAIN, INC.,

Debtors 718 ARCH STREET ASSOCIATES, LTD.

v.

LORI J. BLATSTEIN; MORRIS LIFT; DELAWARECO, INC. (D.C. No. 97-cv-07063)

IN RE: MAIN, INC.,

Debtor 718 ARCH STREET ASSOCIATES, LTD.; MITCHELL M. MILLER, ET AL.

v.

ERIC J. BLATSTEIN; MAIN, INC.; LORI J. BLATSTEIN, ET AL; MORRIS LIFT, CPA;
DELAWARECO, INC.; ENGINE 46 STEAK HOUSE, INC.; REEDCO, INC.; WATERFRONT
MANAGEMENT CORPORATION; COLUMBUSCO, INC.; AIRBEV, INC.; PIER 53 NORTH,
INC.
(D.C. No. 97-cv-07064)

IN RE: MAIN, INC.,

Debtor 718 ARCH STREET ASSOCIATES, LTD.; MITCHELL M. MILLER

v.

ERIC J. BLATSTEIN; LORI J. BLATSTEIN; MAIN, INC.; DELAWARECO, INC.; ENGINE
46
STEAK HOUSE, INC.; REEDCO, INC.; WATERFRONT MANAGEMENT CORPORATION;
COLUMBUSCO, INC.; AIRBEV, INC.; PIER 43 NORTH, INC.; MORRIS LIFT, CPA;
MAIN, INC.
(D.C. No. 97-cv-07066)

IN RE: MAIN INC.;

Debtor 718 ARCH STREET ASSOCIATES, LTD.; MITCHELL M. MILLER

v.

ERIC J. BLATSTEIN; MAIN, INC.; LORI J. BLATSTEIN; MORRIS LIFT, CPA;
DELAWARECO,
INC.; ENGINE 46 STEAK HOUSE, INC.; REEDCO, INC.; WATERFRONT MANAGEMENT
CORPORATION; COLUMBSCO, INC.; AIRBEV, INC.; PIER 53 NORTH, INC. (D.C. No.
97-cv-07069)

IN RE: ERIC J. BLATSTEIN; MAIN, INC.,

Debtors 718 ARCH STREET ASSOCIATES, LTD.

v.

ERIC J. BLATSTEIN; MAIN, INC.; LORI J. BLATSTEIN; MORRIS LIFT, CPA; DELAWARECO,
INC.; ENGINE 46 STEAK HOUSE, INC.; REEDCO, INC., t/a MARGARITA CAFE; WATERFRONT MANAGEMENT CORPORATION; COLUMBUSCO, INC.; AIRBEV, INC.; PIER 53 NORTH, INC. (D.C. No. 97-cv-07070)

718 Arch Street Associates, Ltd., Mitchell W. Miller, Esq., Trustee for the Main, Inc. bankruptcy estate
and Michael H. Kaliner, Esq., Trustee for the Blatstein bankruptcy estate,

Appellants On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C.
Civ. Nos. 97-07063/64/66/69/70) District Judge: Honorable Bruce W. Kauffman

Argued July 12, 1999

BEFORE: GREENBERG, ALITO, and ROSENN, Circuit Judges

(Filed: September 3, 1999)

Steven M. Coren (argued) David Dormont Kaufman, Coren, Ress & Weidman 1525 Locust Street 17th
Floor Philadelphia, PA 19102

Attorneys for Appellants Eric L. Frank Miller, Frank & Miller 21 South 12th Street 640 PSFS Building
Philadelphia, PA 19107

Attorneys for Appellant Mitchell W. Miller Trustee for the Main, Inc. Bankruptcy Estate Edward J.
DiDonato DiDonato & Winterhalter 1818 Market Street, Suite 3520 Philadelphia, PA 19103-3629

Attorneys for Appellee Eric J. Blatstein Kevin J. Carey (argued) Mesirov Gelman Jaffee Cramer &
Jamieson 1735 Market Street, Suite 3800 Philadelphia, PA 19103-7598

Attorneys for Appellee Lori Blatstein

B. Christopher Lee (argued) Jocoby Donner, P.C. 1515 Market Street, Suite 2000 Philadelphia, PA
19102

Attorneys for Non Debtor Corporate Appellees Delawareco, Inc., Engine 46 Steak House, Inc., Reedco,
Inc., Waterfront Management Corporation, Columbusco, Inc., Airbev, Inc., Pier 53 North, Inc.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This case concerns the bankruptcy proceedings of Eric J. Blatstein ("Blatstein") and the attempt by one of his creditors joined by bankruptcy trustees to bring assets into his bankruptcy estate. The creditor, 718 Arch Street Associates, Ltd. ("Arch Street"), brought these adversary proceedings in the bankruptcy court accusing Blatstein of fraudulently transferring his income and his shares in a number of corporations in the restaurant and bar businesses he controlled to his wife, Lori J. Blatstein. Arch Street also asked the bankruptcy court to reverse pierce the veils of the corporations so as to bring their assets into the bankruptcy estates. The trustees of the Blatstein bankruptcy estate and of the bankruptcy estate of Main, Inc. ("Main"), one of the Blatsteins' jointly-held corporations, have intervened as plaintiffs in this action. Arch Street predicated its piercing the veil argument on the contention that the corporations were Blatstein's "alter egos." As we shall explain, a court in a successful reverse piercing case disregards the corporate existence so that the corporation's assets become available to a controlling party's creditors to satisfy his debts. Thus, a reverse piercing case differs from a classical piercing case as in the latter the controlling party is responsible for the corporation's debts. The bankruptcy court and the district court on appeal rejected these fraudulent transfer and reverse piercing claims insofar as the claims are now before us. Arch Street and the trustees then appealed to this court. We will reverse in part, as we find that Eric Blatstein fraudulently transferred his income to his wife in an effort to keep the money from his creditors. We, however, will affirm in part, as we conclude that the bankruptcy and district courts correctly found that there had not been a fraudulent transfer of corporate shares and correctly refused to pierce the corporate veils.

## II. STATEMENT OF THE CASE

This case grew out of Main's September 20, 1996 voluntary Chapter 11 petition. See In re Main, Inc., 213 B.R. 67, 72 (Bankr. E.D. Pa. 1997) ("Main II"), rev'd in part and aff'd in part sub nom., In re Blatstein, 226 B.R. 140 (E.D. Pa. 1998).1 Main converted its case from a Chapter 11 to a Chapter 7 proceeding after a December 18, 1996 hearing in the bankruptcy court on a motion to dismiss its petition. Blatstein then filed a personal Chapter 7 proceeding on December 19, 1996.

Arch Street subsequently brought these adversary proceedings in both the Blatstein and Main bankruptcy cases against Eric and Lori Blatstein, Morris Lift, who was the Blatsteins' accountant and Main's president, and the Blatsteins' various jointly-held corporations.[2] For

---

1. We are using the numerical designation of the Main bankruptcy cases as the parties and the bankruptcy court have used them even though we do not refer to all the Main cases.

2. These corporations are Delawareco, Inc., Engine 46 Steak House Inc., Reedco, Inc., Waterfront Management Corporation, Columbusco, Inc., simplicity's sake, however, we will refer to the appellees collectively as "Blatstein" or "the Blatsteins," as appropriate in the context. Michael H. Kaliner, trustee of the Blatstein bankruptcy estate, and Mitchell Miller, trustee of the Main bankruptcy estate, intervened as plaintiffs in the proceedings and are appellants here. Nevertheless, we will refer to the appellants collectively as "Arch Street."

Before filing these proceedings, 718 Arch Street Associates, Ltd. obtained a judgment by confession in state court against Blatstein individually on November 12, 1992, for $2,774,803 on account of a breach of a commercial lease. Subsequently, in connection with garnishment proceedings to enforce the judgment, the state court entered the judgment against Main.

In its complaints in the bankruptcy court, Arch Street alleged, inter alia, that Lori Blatstein was not truly a co- owner of the corporations, Blatstein fraudulently transferred all of his income from the corporations to her to avoid paying his creditors, Blatstein fraudulently transferred Main's assets to Lift and other corporations he controlled, and the Blatsteins' corporations were Blatstein's alter egos and should be held responsible for his debts.

The bankruptcy court held that Blatstein fraudulently conveyed his assets in Main to Lift and other corporations Blatstein controlled in a ruling which is not before us for review. Accordingly, pursuant to 11 U.S.C. SS 727(a)(2)(A) and (a)(7) the bankruptcy court refused to discharge him. Main II, 213 B.R. at 85. The court, however, rejected Arch Street's arguments that the corporate defendants were the alter egos either of Blatstein or of each other and that Blatstein fraudulently transferred his assets to his wife. Id. at 87-95. The bankruptcy court on further proceedings, which included Arch Street's motion for

reconsideration of the order in Main II, calculated Arch Street's claim for rents due as $582,443.65. In re Main, Inc., 1997 WL 626544, at

---

Airbev, Inc., and Pier 53 North, Inc. The bankruptcy court found that all the corporate defendants were Pennsylvania corporations jointly owned by Eric and Lori Blatstein as tenants by the entireties. See Main II, 213 B.R. at 74. *12 (Bankr. E.D. Pa. Oct. 7, 1997) ("Main III"). The court partially granted the motion for reconsideration with respect to the procedural implementation of the order in Main II but did not disturb the substantive dispositions we have described.

On appeal, the district court affirmed the bankruptcy court's rejection both of Arch Street's claims that the Blatsteins' corporations were Blatstein's alter egos and that he had fraudulently transferred his corporate shares and income to his wife, but reversed and remanded for further proceedings in the bankruptcy court that court's ruling that Blatstein fraudulently transferred Main's assets. In re Blatstein, 226 B.R. 140, 148 (E.D. Pa. 1998). 3 Arch Street now appeals the district court's order affirming the bankruptcy court's ruling against its alter ego and fraudulent transfer claims. As we have indicated, we will reverse in part and affirm in part.

III. DISCUSSION

Arch Street contends that the district court erred in rejecting the fraudulent transfer claims because the court failed to take into account (1) Blatstein's insolvency at the time of the transfers, (2) the Blatsteins' fraudulent intention in effectuating the transfers, and (3) Lori Blatstein's failure to prove that she gave reasonably equivalent value for the transfers. Arch Street contends that because of these legal errors, the district court erroneously failed to recognize that Arch Street had proven that the transfers were fraudulent as a matter of law.

Arch Street also contends, on the theory that the Blatsteins' corporations were his alter egos, that the district court erred in affirming the bankruptcy court's refusal to pierce the corporate veils. Arch Street argues that the court did not account properly for its contentions that (1) the corporations operated as facades for Blatstein, (2) Blatstein

---

3. On remand, the bankruptcy court reconsidered its opinion, yet once again concluded that the transfer of

Main's assets was fraudulent. In re Main, 1998 WL 778017, at *14-*16 (Bankr. E.D. Pa. Nov. 4, 1998) ("Main V"). used the corporations to hinder, delay, and defraud his creditors, and (3) Blatstein commingled corporate funds with his personal funds.

Blatstein initially argues, however, that we should not reach the merits of the appeal as we lack jurisdiction to do so. Because this jurisdictional argument would require us to dismiss the appeal without considering the case on the merits, we will deal with it first. Alternatively, Blatstein urges that we affirm the district court's order.

A. Standard of Review

We exercise plenary review over the question of whether we have jurisdiction to entertain this appeal. See In re Meyertech Corp., 831 F.2d 410, 413-14 (3d Cir. 1987). Likewise, we have plenary review over the district court's application of legal precepts. See In re Brown , 951 F.2d 564, 567 (3d Cir. 1991). On the other hand, we review the bankruptcy court's factual findings for clear error. See id. See also In re Forcroft Square Co., 184 B.R. 671, 675 (E.D. Pa. 1995) ("[T]he determination of whether there is . . . intent to defraud [under Pennsylvania law] is a finding of fact which should not be set aside on appellate review unless that finding was clearly erroneous.") (citing United States v. Tabor Ct. Realty Corp., 803 F.2d 1288, 1304 (3d Cir. 1986); In re Adeeb, 787 F.2d 1339, 1342 (9th Cir. 1986)).

B. Whether our jurisdiction is properly invoked

As we have indicated, before reaching the merits of this dispute we first must determine whether we have jurisdiction. This jurisdictional issue is implicated because the district court's order in part remanded the case for further proceedings in the bankruptcy court. Moreover, there will be additional proceedings involving numerous issues with respect to the bankruptcy estates in both the district and bankruptcy courts.

In bankruptcy cases, we have jurisdiction pursuant to 28 U.S.C. § 158(d) over appeals from "final decisions, judgments, orders, and decrees entered," as here, by a district court in its appellate capacity under 28 U.S.C. § 158(a). Yet, we have recognized that in a bankruptcy context we consider the question of whether an order or judgment is final "in a more pragmatic and less technical sense than in other matters. . . ." Meyertech Corp., 831 F.2d at 414. Determining whether an appellant has invoked our jurisdiction

properly entails "balancing a general reluctance to expand traditional interpretations regarding finality and a desire to effectuate a practical termination of the matter before us." Id. The relevant factors consist of (1) the impact of our consideration of the merits of the appeal upon the assets of the bankrupt estate, (2) the necessity for further fact-finding on remand, (3) the preclusive effect of a decision on the merits on further litigation, and (4) whether the interest of judicial economy would be furthered by the exercise of jurisdiction. Id. We have held that the impact upon the assets of the estate is the "most important" factor in this balancing scheme. See In re Market Square Inn, Inc., 978 F.2d 116, 120 (3d Cir. 1992).

Applying these factors here, we conclude that we have jurisdiction to consider Arch Street's appeal, as all four factors weigh in favor of our exercise of jurisdiction. First and foremost, this appeal concerns identifying assets of Blatstein's estate. Plainly, a reversal of the district court's order and a determination that Blatstein fraudulently conveyed his assets to his wife or that the Blatsteins' corporations are his alter egos, would result in the inclusion in his bankruptcy estate of substantial assets which then would be available to satisfy, at least in part, his creditors' claims. On the other hand, if we were to affirm the district court's order, the assets in the estate effectively would be determined.

Second, contrary to Blatstein's assertion in his brief, we find no need for additional fact-finding on remand. This appeal concerns three overarching matters, two involving fraudulent transfers and one involving piercing corporate veils, none of which will be duplicated in further proceedings in the district or bankruptcy courts, and none of which depends upon any facts still at issue or which will be determined during subsequent proceedings. Third, there can be no question but that our decision will be preclusive. Finally, we serve judicial economy by consideration of these claims. Thus, we conclude that we have jurisdiction and will consider this appeal on the merits. See In re Simpson, 36 F.3d 450, 452 (5th Cir. 1994) (per curiam) (exercising jurisdiction over a trustee's appeal of a district court's order reversing the bankruptcy court's finding of a fraudulent transfer of an asset).

C. The fraudulent transfer claims

1. An overview

The bankruptcy court rejected Arch Street's claims that Blatstein fraudulently transferred his stock in the

jointly owned corporations and his income derived from the businesses to Lori Blatstein. In this regard it reasoned that all of the stock certificates indicated that the Blatsteins owned the corporations as tenants by the entireties and had so owned them since their inception. Moreover, it accepted Lori Blatstein's testimony that the couple had opened her personal bank account and deposited Blatstein's income into it because of his bad reputation with banks and to avoid a federal tax lien on Blatstein's assets. Main II, 213 B.R. at 93-95. The bankruptcy court's decision rested, then, upon its belief that (1) Blatstein did not transfer assets to Lori Blatstein, and (2) if there were any transfers from Blatstein to Lori Blatstein, then in making the transfers Blatstein did not possess an actual intent to defraud his creditors under Pennsylvania law which the parties agree is applicable.

On reconsideration, the bankruptcy court again rejected Arch Street's fraudulent transfer claims. Main III, 1997 WL 626544, at *4-*6. This time the court rejected a "constructive fraud" theory of intent by pointing out that Blatstein's income came from the corporations the Blatsteins co-owned, and thus "were not the same as paychecks from a third-party employer," but instead "could be viewed as distributions of dividends or equity from the corporations. . . ." Id. at *6. Therefore, the court implicitly found that Blatstein did not transfer any earned income to Lori when he deposited his income into her personal accounts. Moreover, inasmuch as Lori used these deposits to satisfy the Blatsteins' joint obligations and the debts of the various corporations, the court found it "impossible, on this record, to find that `reasonably equivalent value' was not given to Blatstein and the corporations in exchange for their deposits into these accounts." Id. The district court affirmed the bankruptcy court's findings on these issues. Blatstein, 226 B.R. at 159-60.

On this appeal, Arch Street contends that the bankruptcy court's factual findings should have led that court to conclude that Blatstein possessed an actual intent to defraud his creditors when he issued stock in Lori's name and when he made deposits into Lori's personal accounts. Arch Street also argues that even if we were to find that Blatstein did not actually intend to defraud his creditors, we should hold that his transfers were fraudulent because they fail Pennsylvania's "constructive fraud" analysis applicable in fraudulent transfer cases. Arch Street contends that the bankruptcy and district courts erred by incorrectly placing the burden of proof on it, instead of shifting the burden to Lori to establish by clear and convincing evidence either that

Blatstein was solvent at the time of the transfers or that she gave him fair consideration for the conveyances.

We will affirm the district court's order affirming the bankruptcy court's finding that Blatstein did not fraudulently transfer corporate shares to his wife, but will reverse the district court's order affirming the bankruptcy court's finding concerning his income transfers to her personal bank account.

Initially on these fraudulent transfer issues we set forth the germane state law. The Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA") provides that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor" was insolvent at the time of the transfer or became insolvent as a result of it. 12 Pa. Cons. Stat. Ann. § 5104 (West 1999). The first provision provides for liability under an "actual intent" theory of fraud, while the second is a "constructive fraud" provision. 2. The stock "transfers"

The bankruptcy and district courts rested their holdings on their belief that the Blatsteins did not transfer any stock between them because they owned all the corporate stock at all times from their inception as tenants by the entireties. We agree. Pennsylvania defines an "asset" for PUFTA purposes as the "property of a debtor" but not including "an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant." 12 Pa. Cons. Stat. Ann. §5101(b). Thus, if the Blatsteins always owned their corporations as tenants by the entireties, Arch Street's allegation that Blatstein transferred them to Lori Blatstein to defraud his creditors must fail.

We reach this conclusion even in the face of evidence that Blatstein alone provided or arranged for the assets to establish the businesses and that Lori Blatstein did not know that she was a joint owner of the corporations. 4 As the bankruptcy court noted, Pennsylvania law presumes that property titled to a husband and wife is owned by them as tenants by the entireties even if only one spouse paid for the property or even if one spouse was unaware of her ownership of the property. Main II, 213 B.R. at 93 (relying upon In re Estate of Holmes, 200 A.2d 745, 747 (Pa. 1964)). Because the Blatsteins always had held their corporate shares as tenants by the entireties, Blatstein never "transferred" any shares to his wife, and thus could not

have fraudulently transferred the shares to her. Accordingly, we will affirm the district and bankruptcy courts on this point.

_____

4. We do not deal with a situation in which it is claimed that there was a fraudulent transfer of assets to a jointly owned corporation and that that transfer should be set aside. Arch Street repeatedly sets forth that it was the titling of the stock that was the fraudulent transfer. Thus, it states the issue as follows: "Whether the bankruptcy court (and district court) erred in ruling that Blatstein's titling of the stock of his corporation in the names of Blatstein and Lori Blatstein as tenants by the entireties, while Blatstein was insolvent, were not fraudulent transfers." Br. at 2. See also br. at 26, 29-30, 47. 3. Blatstein's income "transfers"

We reject, however, the bankruptcy court's conclusions with respect to Blatstein's income transfers to Lori's personal bank accounts. Unquestionably, Lori would have been entitled to dividends from the corporations. So we would uphold transfers of that nature. But the bankruptcy court held that Eric's income checks constituted income of that character because the checks "were not the same as paychecks from a third-party employer," but instead "could be viewed as distributions of dividends or equity from the corporations. . . ." Main III, 1997 WL 626544, at *6 (emphasis added).

We reject this conclusion. First, the payments were made by the corporations only to Blatstein and not to Lori Blatstein. Furthermore, the form of payments reflected reality as Blatstein undoubtedly operated the businesses. In fact, as Arch Street pointed out in its brief and again at oral argument, Blatstein treated his paychecks as wages or Schedule C sole-proprietorship income on his tax returns and not as dividends or distributions to a shareholder. Br. at 45. Likewise, the corporations treated the payments as wages or commissions and not as distributions to a shareholder.

While the bankruptcy court viewed the determination of the character of the income as a factual matter, even reviewing for clear error, see Brown, 951 F.2d at 567, we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542 (1948). Consequently, we hold that the court's finding that Blatstein did not transfer his income to Lori Blatstein was clearly erroneous. In sum, we see no reason why income that in form and fact was earned for services should be reclassified as dividends or equity distributions.

Our conclusion that Blatstein's income was earned income leads us to consider the bankruptcy court'sfinding that he deposited his income into Lori's accounts because his credit and reputation with banks was poor, and because he "was trying to keep the funds from being seized or frozen by the IRS or other taxing authorities, pursuant to a tax lien, in light of the personal income taxes which he owed to the IRS." Main II, 213 B.R. at 94. The bankruptcy court further noted that "taxes were paid from[a brokerage] Account, and therefore no fraud on the IRS or other taxing authorities appears to have been effected." Id. These findings are significant because, notwithstanding the bankruptcy court's contrary conclusion, they clearly demonstrate that despite the payment of some taxes, Blatstein intended to defraud the Internal Revenue Service, one of his creditors.

PUFTA does not require proof to set aside a transfer that the debtor intended to defraud the specific creditor bringing the fraudulent transfer claim. PUFTA deems a transfer fraudulent if the debtor had the "actual intent to hinder, delay or defraud any creditor. . . ." 12 Pa. Cons. Stat. Ann. § 5104 (emphasis added). Similarly, the courts apply the bankruptcy code's denial of discharge provision, 11 U.S.C. § 727(a)(2)(A), to "require[ ] only that the debtor make the transfer with intent to hinder, delay, or defraud`a creditor.' There is no requirement that the debtor intend to hinder all of his creditors." Adeeb, 787 F.2d at 1343.

We recognize that the bankruptcy court indicated that Blatstein intended to shield the income to pay some of his debts, including reducing some of his tax liability as the court noted that "taxes were paid from [a brokerage] Account, and therefore no fraud on the IRS or other taxing authorities appears to have been effected." Main II, 213 B.R. at 94. Nevertheless, as the Adeeb court stated: "Our inquiry under [11 U.S.C. § ] 727(a)(2)(A) is whether [debtor] intended to hinder or delay a creditor. If he did, he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." 787 F.2d at 1343. We will apply the same principle under PUFTA. See also In re Greene, 202 B.R. 68, 73 (Bankr. D. Md. 1996) (holding that debtor's attempt to avoid one creditor's collection efforts in an effort to allow him to pay other creditors "does not change the fact that Debtor transferred . . . assets with the actual intent to hinder" a creditor); In re Cooper, 150 B.R. 462, 467 (D. Colo. 1993) (holding transfers to wife were fraudulent even though wife was one of debtor's creditors); United States v. Purcell , 798 F. Supp. 1102,

1113 (E.D. Pa. 1991), aff 'd, 972 F.2d 1334 (3d Cir. 1992) (table) (finding a conveyance fraudulent under PUFTA's predecessor when defendant attempted to avoid federal tax lien by conveying his property to his wife as a tenant by the entireties). Thus, we conclude that the bankruptcy court's determination that Blatstein did not have the actual intent to defraud his creditors was erroneous.[5]

Furthermore, although not necessary for our result, we note that the bankruptcy court erred in its "constructive fraud" analysis by incorrectly placing on Arch Street the burden of proving that reasonably equivalent value was not given for the transfer: "[W]e believe that lack of `reasonably equivalent value' for the transfer is not proven. . . ." Main III, 1997 WL 626544, at *6. In fact, if the grantor is in debt at the time of a transfer PUFTA places on the grantee the burden of proving by clear and convincing evidence either that the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance. See Elliott v. Kiesewetter, 98 F.3d 47, 56– 57 (3d Cir. 1996).[6] Inasmuch, as the bankruptcy court found that, "the record supports Blatstein's insolvency at the time of his transfers to Lori," Main III, 1997 WL 626544, at *6, Lori could have defeated a constructive fraud claim solely by proving that she gave adequate consideration for the transfers.

_____

5. The bankruptcy court also ignored (without explanation) an admission by Lori Blatstein in a pre-trial deposition that"the Arch judgment was a factor" in the Blatsteins' decision to put Blatstein's income into her personal accounts. Main II, 213 B.R. at 93–94. This testimony demonstrates that, in addition to avoiding the IRS's tax lien, Blatstein also intended to hinder Arch Street's attempts to collect its judgment, and provides another basis for our conclusion that he possessed the actual intent to defraud his creditors under PUFTA.

6. Moreover, according to a long-standing district court case, this burden may be heavier on a grantor's wife when she is the grantee: "the burden is on the wife to show by clear and satisfactory evidence, beyond that required of other creditors, that at the time of the transfer he was solvent or that she paid full consideration." Winter v. Welker, 174 F. Supp. 836, 843 (E.D. Pa. 1959). The bankruptcy court found Blatstein's testimony on this issue to be credible and relied upon it to hold that Lori had given reasonably equivalent value for the deposit of his income into her accounts. Specifically, the court reasoned that Lori received income from Blatstein that ultimately could be viewed as a dividend on her half-ownership of the

corporations, and used this income to pay off certain of the Blatsteins' joint debts as well as debts owed by the corporations. Id.

Yet, by failing to place the burden on Lori to prove that she gave reasonable consideration, the court did not adopt the more plausible interpretation of the facts: that Blatstein retained control over the funds despite transferring them to his wife. Lori Blatstein used the funds both for her benefit and that of her husband for such purposes as paying their joint debts and putting aside money for their children's college educations. These payments suggest that Blatstein's conveyances were in title only, and that instead of giving her husband consideration in the form of payment of his debts, Lori merely was using the money where Blatstein directed her to use it.

In this regard we note that the bankruptcy court, which had an opportunity to observe the Blatsteins testify, described Lori's role "as a faithful spouse, homemaker, and occasional business partner." Without shifting the burden of proof to Lori on the consideration issue, the bankruptcy court could not make a proper ruling on the point. Nevertheless, in light of our holding that Blatstein possessed an actual intent to defraud his creditors, it is not necessary for us to remand for consideration of the income transfers under the constructive fraud provisions of PUFTA.

D. The alter ego claims

Arch Street's final argument on appeal is that the bankruptcy and district courts erred in failing to reverse pierce the veils of the Blatsteins' corporations to satisfy Blatstein's debts. Arch Street contends that the bankruptcy court made the necessary factual findings yet erred in applying the law to these findings, resulting in its erroneous conclusion that the Blatsteins' corporations were not Blatstein's alter egos and that they were not the alter egos of each other.[7]

The bankruptcy court held that the Blatsteins' corporations were not Blatstein's alter egos despite the presence of some factors that weighed in favor of piercing the corporate veils. For example, the court found that the corporations paid numerous personal expenses of the Blatsteins and made interest-free loans to them. Main II, 213 B.R. at 89-90. Nevertheless, the court declined to pierce the corporate veils, primarily by relying on Arch Street's expert's testimony on cross-examination. The expert recognized that the Blatsteins declared these amounts on their joint income tax returns as income, and that the corporations took

deductions on their tax returns for these amounts. Id. at 91. Moreover, while he recognized that as a result of the interaction between Blatstein and Main, Main did not owe Blatstein money (which would indicate that Blatstein had invested heavily in Main to hide his assets in the corporation), he noted that Blatstein owed Main $402,000. Id. Further, he noted that while the corporations paid $269,000 of the Blatsteins' personal expenses, the Blatsteins paid $360,000 of the corporations' expenses. Id.

The court also recounted that Blatstein's expert's testimony supported upholding the corporate form. The expert testified that the corporate transactions were not made to hinder Blatstein's creditors, and that "since there were no transfers to the corporations from Blatstein, he could not have technically engaged in any fraudulent conveyance." Id. Moreover, the expert indicated that the transfers to Blatstein actually benefitted his creditors, and that closely-held corporations often grant interest-free loans to their officers and pay their officers' expenses as long as these amounts are reflected on their books as compensation. Id. In fact, he testified that it would be

_____

7. Arch Street does not press vigorously before us its claim that the corporations were each others' alter egos which is weaker than its claim that they were Blatstein's alter egos. For this reason, and in light of our rejection of Arch Street's stronger alter ego claim, we will affirm the district court's rejection of it without discussion. unusual for a corporation to charge interest in such a situation. Id. at 92.

Thus, the court concluded, that while some factors weighed in favor of piercing the corporate veils, the lack of evidence of other factors was dispositive. First, the court found "no proof that the various corporations . .. were in existence only to benefit [Blatstein's] private concerns." Id. at 91. In fact, it appeared that all of the corporations other than Main were financially stable and successful businesses. Id. Second, the court found no proof in the record to support a conclusion that the Blatsteins abused the corporate form for illegitimate purposes. Id. Third, the court found that each corporation adhered to corporate formalities by keeping its own financial records and bank accounts and by recording each loan granted to the Blatsteins. Id. Finally, the court concluded that except for the fraudulent transfers regarding Main, none of the corporations committed any fraudulent acts, nor was there evidence that Blatstein siphoned funds either in or out of them. Id. at 92. Thus, except for the fraudulent transfers of Main, neither Blatstein nor the other corporations

worked injustice upon the creditors, and hence equity did not require piercing the corporate veils. Id.

After setting forth the appropriate legal precepts, the district court agreed with the bankruptcy court's assessment. Blatstein, 226 B.R. at 158-59. The court emphasized that while the corporations paid the Blatsteins' personal expenses and provided them with interest-free loans, these amounts were recorded in the corporate ledgers and were reported to the IRS as income. Id. at 159. The court also emphasized the fact that "rather than using the corporate entities to shelter funds otherwise available to his creditors, Blatstein was a net debtor to his corporations, owing Main in excess of $400,000." Id. Therefore, the district court affirmed the bankruptcy court's refusal to pierce the corporate veils. Id. We will affirm the district court on this point. Pennsylvania law, applicable here, recognizes a strong presumption against piercing the corporate veil. See Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995). The "classical" piercing of the corporate veil is an equitable remedy whereby a court disregards "the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation." In re Schuster, 132 B.R. 604, 607 (Bankr. D. Minn. 1991). In those instances, we have stated that the factors weighing in favor of piercing the veil include:

failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994) (internal quotation marks omitted), aff'd, 514 U.S. 938, 115 S.Ct. 1920 (1995). We also recognized in Kaplan that courts sometimes consider undercapitalization a relevant factor, and that

[n]ot every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil. That remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes.

Id.

While a classical piercing renders a shareholder responsible for the actions of the corporation, in a "
`reverse' piercing, assets of the corporate entity are used to satisfy the debts of a corporate insider so that
the corporate entity and the individual will be considered one and the same." In re Mass, 178 B.R. 626, 627
(M.D. Pa. 1995). See also In re Schuster, 132 B.R. at 607. It is not surprising that it has been recognized
that only "exceptional circumstances" warrant granting this "unusual" remedy. In re Mass, 178 B.R. at 627.
Consequently, a court should use its equitable powers to disregard the corporate form only if reverse
piercing of the veil "will prevent fraud, illegality, injustice, [or] a contravention of public policy. . . ." In re
Mass, 178 B.R. at 629 (internal quotation marks omitted).

The district court in Mass did uphold the bankruptcy court's decision to reverse pierce the corporate veil of
Mountain Cleaners, the debtors' corporation in that case. 178 B.R. at 631. Borrowing the analysis of
Schuster, 132 B.R. 604, the court analyzed the "balance between debtor's and creditor's remedies which
the bankruptcy system is intended to serve." Mass, 178 B.R. at 629. The law imposes this balance whereby
the "debtor receives the equitable remedy of discharge and the creditor the remedy of receiving a pro rata
share of the value which the [Bankruptcy] Code dictates must be available to creditors after the debtor's
`fresh start.' " Id. at 629-30.

After applying this balancing test, the Mass court decided that the facts warranted a reverse piercing:

In this case, there was a total failure to observe any corporate formalities by the debtors; there were no
directors' or shareholders' meetings and no dividends were paid; there are no corporate records; no
corporate tax records were maintained; the business premises were not leased to the corporation; and at no
time was the dry cleaning business conducted as a corporate entity. At all times the debtors used the
proceeds of the business as if they were the assets of the individual debtors themselves.

Id. at 630. In contrast the bankruptcy court in this case simply did not find equivalent factors present.

Furthermore, the Mass court found significant the fact that the debtors had changed a personal business
account into a corporate account yet continued using the account for personal expenses after filing the

Chapter 11 proceeding. Id. at 628. Indeed, "the debtors maintained no other bank accounts, personal or
business, during the bankruptcy case." Id. In fact, the only corporate actions the debtors had taken were the
transfer of their checking account into the corporation's name and the execution of an equipment lease with a
telephone company that lay at the crux of the suit. Id.8 Accordingly, the court held that "the account at issue
served as the exclusive `debtor-in- possession' account" and that " `it was estate funds, not `corporate'
funds, that were placed in the account.' " Id. at 631.

The situation here is different. Although the Blatsteins did not run their corporations as strictly separate
entities, they did uphold the corporate form sufficiently by having the corporations keep separate records
and bank accounts, and entering on the books all loans the corporations made to each other and to the
shareholders.

Moreover, this case lacks an equitable justification for reverse piercing the corporate veils. Arch Street
contends that the limited commingling of funds and payment of personal expenses by the corporations was
part of an elaborate plan by which Blatstein was attempting to frustrate his creditors' collection efforts.
Although such an assertion, if true, might provide the equitable justification otherwise absent here, the
bankruptcy court found the opposite to be true. The bankruptcy court found that Blatstein did not hide any
of his personal assets in the corporations, nor did he commingle his assets with the corporations' assets so
that separation would be impossible. We find no basis in the record to justify a conclusion that the court's
finding was clearly erroneous. Hence, unlike in Mass, the assets that in this case are corporate assets in form
are, in fact, corporate assets and are not part of Blatstein's bankruptcy estate. Consequently, we uphold the
district court's order affirming the bankruptcy court's decision to deny Arch Street the remedy of reverse
piercing.

_____

8. Basically, Bell Atlantic had leased the corporation some telephone equipment, and was attempting to
receive full payment of the lease after the corporation breached its contract. The debtors and the trustee of
the bankruptcy estate brought the action to pierce the corporate veil of the cleaning business to bring the
corporation's assets into the bankruptcy estate and thus force Bell Atlantic to advance its claim through the
estate.

IV. CONCLUSION

For the foregoing reasons, we will reverse the portion of the district court's order affirming the bankruptcy court's order holding that Blatstein did not fraudulently transfer his income to Lori Blatstein's personal bank accounts, and will affirm the portions of the district court's order affirming the bankruptcy court's determinations concerning the alleged fraudulent transfers of corporate shares and refusal to reverse pierce the corporate veils of the Blatsteins' corporations. We will remand the case to the district court for further proceedings consistent with this opinion. The parties will bear their own costs on this appeal. ROSENN, Circuit Judge, concurring and dissenting:

I concur and join with the majority except with respect to the alter ego issue and the question relating to Blatstein's transfer of stock to his wife, Lori. I do not reach this latter issue in light of my position on alter ego. As to the former issue, I believe that this record establishes that at all times Eric Blatstein1 used the non-debtor corporations as his personal pawns. He manipulated them at will to hinder and avoid his personal creditors by unrestrictedly drawing checks on each of them to meet personal expenses, purchases, and other obligations. He ignored the corporate form and the separate personalities of the corporations. I, therefore, respectfully dissent on the alter ego claims.

As president and chief executive officer, Blatstein controlled and dominated the corporations' finances, policies, and business practices. Except for obtaining the articles of incorporation, only minimum corporate formalities were observed. Although the Blatsteins claimed they owned the corporate stock by the entireties, Lori Blatstein, his wife, did not know she owned any corporate stock, possessed no certificate, and she made no payment for any.

Extensive corporate loans were obtained and extended without corporate resolutions, either formal or informal, and there were no meetings of the board of directors or stockholders. When Blatstein deemed it desirable, the corporations engaged in fraudulent transfers, not only by Main, but with the participation of CFI and Columbusco. The corporate form was ignored whenever it suited Blatstein's convenience. Blatstein also fraudulently transferred his income derived from the corporations to Lori's bank account. For these reasons and more, as I discuss infra, I believe the corporate veil as to all corporate defendants should be pierced to avoid manifest injustice.

I.

The doctrine that a corporation is a legal entity separate and apart from the shareholders composing it is a legal _____

1. References in this dissent to "Blatstein" are to Eric Blatstein only.

fiction designed to serve convenience and justice. It will be disregarded whenever justice or public policy demands. "[W]henever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate entity may properly be disregarded." Ragan v. Tri-County Excavating, Inc., 62 F.3d 501, 508 (3d Cir. 1995) (quoting Ashley v. Ashley, 393 A.2d 637, 641 (Pa. 1978)).

Although courts will not lightly pierce a corporate veil, nevertheless in an appropriate case and in furtherance of the ends of justice, a corporation and the persons who own its stock and assets will be treated as identical. Cunningham v. Rendezvous, Inc., 699 F.2d 676, 680 (4th Cir. 1983); Hanrahan v. Audubon Builders, Inc., 614 A.2d 748, 753 (Pa. Super. 1992). The effect of such a decision in this case appropriately would sweep all of the assets of the non-debtor defendants into the Blatstein estate, an objective sought by the trustees and the other plaintiffs, and one that is just. In United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981), we fashioned a federal rule and held that the corporate entity could be disregarded and the principal stockholder held liable to a creditor of the corporation where relevant factors as set forth in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681 (4th Cir. 1976), showed that piercing the corporate veil was appropriate.

Factors to be considered in whether to pierce a corporate veil are gross undercapitalization and

failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

Pisani, 646 F.2d at 88 (quoting DeWitt Truck Brokers, 540 F.2d at 686–87).

In Pisani, this court also found relevant additional factors favoring piercing the corporate veil, such as operating the corporation with large sums loaned by the stockholder to the corporation and repayment with

corporate funds while the corporation was failing, and keeping the corporation undercapitalized by lending it money instead of investing equity. Id.

As the majority observes, the bankruptcy court, relying heavily on testimony of defendants' expert witness, Miller, declined to pierce the corporate veil. The bankruptcy judge relied on Miller, although he realized that Miller's experience with debtors of questionable moral and legal standards "may have jaded his perceptions." Main II, 213 B.R. at 82. He also thought that Miller was "occasionally over-aggressive in defending himself from what he claimed were distortions of the facts introduced by Plaintiffs' counsel." Id. at 77. Miller apparently impressed the bankruptcy court with his general thesis that in his experience, "he had observed all or most of the practices at issue and found them acceptable business practices." Id. Two or more wrongs, however, do not make a right and, in some instances, Miller's testimony has the ring of judge and jury, as well as expert.

As the majority observes, the bankruptcy court found no proof that the various corporations were in existence only to benefit Blatstein's private concerns, or for illegitimate purposes. It also appeared to the court that all of the corporations other than Main were financially stable and successful businesses. As I discuss below, they were not. In addition, the court found that each corporation adhered to corporate formalities by keeping its own financial records and bank accounts, and by recording each loan granted to the Blatsteins. I disagree with the court's conclusions, some of which are couched as findings, for reasons that follow, and I do not believe that keeping financial records by each corporation is sufficient to determine whether they adhered to corporate formalities in light of the evidence to the contrary.2 The bankruptcy court ignored significant factors that justify piercing the corporate veil.

_____

2. This court reviews the bankruptcy court's legal conclusions de novo, factual findings for clear error, and exercises of discretion for abuse of discretion. See Interface Group–Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 130–31 (3d Cir. 1998). This court has plenary review of the district court's order. Id. I believe an analysis of the alter ego issue must begin with an understanding of the role and character of the principal players in the activities of the corporations.

The architect in the formation of the non-debtor corporations is Eric Blatstein, now bankrupt and insolvent

since 1980 when the IRS filed a lien against all of his property. His wife, Lori, collaborated with him, serving "as a faithful spouse, homemaker, and occasional business partner." Main II, 213 B.R. at 77. Also playing an important role is Morris Lift, Blatstein's accountant andfinancier. Lift made loans to Blatstein or on Blatstein's behalf to the corporations through various unwritten arrangements. Actively participating in the "sham foreclosure" of Main and the fraudulent transfer of some of its assets to some of the non-debtor corporations, he assisted Blatstein in his persistent efforts to defeat the claims of his creditors. According to the bankruptcy court:

Prior to July 1996, Blatstein was the chief executive officer ("CEO") and president of all of the corporate Defendants. He remains as president and CEO of all of the corporate defendants except Main, of which Lift became president as of July 1996 after "foreclosing" on the assets and stock of Main on July 25, 1996. Blatstein has final decision-making power and is the sole individual with check writing authority for all of the corporations in issue, including Main, the latter of which all of the defense witnesses agree Lift allowed him to continue to "run" after the "foreclosure" by Lift. The employees of all of these corporations act under Blatstein's direction.

Id. at 74.

The bankruptcy court also found that Lift had been an "insider" of some of the debtors in the critical months prior to their filing; that Lift's foreclosure on his note against Main of its assets was a sham transaction, and that"the transfer of most or all of Main's assets to a series of other Blatstein-controlled entities within the year prior to the bankruptcy filings constituted `actual' fraudulent conveyances which must be set aside." Id. at 67. The collusive foreclosure sale was arranged to prevent Arch from executing on its judgment against Main's assets. The court found Lift's claims of innocence not credible, id. at 81, and found him to be "a willing accomplice to a fraudulent conveyance." Id. at 81-82. The court found the credibility of Lift and Blatstein highly questionable as to numerous issues throughout the trial. Id. at 13.

The bankruptcy court was convinced that at all times Blatstein had been "in control of the corporate defendants' management and operations." The court was also persuaded that when Blatstein testified that he directed Shoop, the controller for each of the corporations, to deposit all funds of Main after its bank

accounts were garnished, and all of Main's accounts receivable, into Reedco's accounts and later into CFI's accounts, this testimony constituted an admission "that his intentions were to hinder and/or delay Arch from executing on its judgment against Main." Id. at 83. The court also rejected Miller's attempts to trivialize this wrongdoing as a standard business practice. Id. The court found that the transfers orchestrated by Blatstein rendered Main "an insolvent, worthless shell," and constituted an actual fraudulent conveyance of Main assets to Reedco, CFI, Lift and Columbusco within one year of Blatstein's bankruptcy. Main II, 213 B.R. at 83.

I turn now to an analysis of the corporate ownership. Although the Blatsteins professed to hold the capital stock of each of the corporations by the entireties, this representation is suspect. Blatstein testified that his wife Lori did not pay for stock in the corporations and wrote no check in purchase of the stock. Lori also admitted that she did not know whether she owned stock in the corporations, and, after an effort to evade answering questions pertaining to her stock interest, testified that no stock certificate was ever issued to her. She also admitted that she never paid anything to purchase stock in the companies.3 When

_____

3. Lori testified:

Q. That wasn't my question. The question was, isn't it true you have never been given a stock certificate that has your name on it. confronted with his federal tax returns prepared by Lift and returns filed with the Commonwealth of Pennsylvania, Blatstein admitted that each of them reported, under Blatstein's oath, that he was the sole owner of the corporations.

The plaintiffs assert that Blatstein treated the corporations as a single entity. I agree. The Waterfront Management Corporation was organized for the purpose of managing all of the corporations and Shoop served as controller, as well as controller for each of the non-debtor corporations. Blatstein instructed Shoop that if one of his corporations lacked sufficient funds to pay its bills to use the funds of another corporation. For example, in 1996 the aggregate expenses paid by one corporation on behalf of another amounted to $554,749, a not insignificant sum. These frequent intercompany payments do not show "financially stable and successful businesses." A corporation charged no interest on intercompany"loans" and there was no agreement as to when or how they were to be repaid. Id. at 92. The court found that these

intercompany transactions were numerous; the court noted that Airbev paid $150,000 of Delawareco's
taxes. Engine 46 paid the start up costs for Airbev, and Main did the same for Reedco. Id. The companies
also made frequent

_____

A. Yes.

Q. And you have not paid cash to purchase stock in any of the companies that your husband runs, is that
correct?

A. Correct.

Q. And you don't think that you ever wrote a check to purchase stock in any of the companies that your
husband runs, is that correct?

A. Not that I can recall.

Q. As a matter of fact, you can't tell if you ever paid anything to purchase stock in any of the companies that
your husband runs, is that right?

* * *

A. Not that I can recall. payments on Blatstein's $500,000 personal tax liability to the Internal Revenue
Service on his prior companies that failed. It is evident that the corporations were grossly undercapitalized;
they each borrowed money from each other for start up costs and for capital.

The various corporations paid personal expenses of Blatstein, which were treated as loans. "No loan
documents were ever executed," id., and there were no documents to show when they would be repaid.
The records were unclear to the court regarding how much money Blatstein owed Main on monies
advanced in his behalf for payment of personal expenses, although one exhibit introduced at trial showed a
sum in excess of $400,000. Id.

Essentially, Blatstein used his corporations as his personal bank. Whenever Blatstein paid his personal
obligations, whether expenses, real estate purchases, personal taxes or old debts, he drew checks on the
corporations. He had no personal bank account. In August 1996, Columbusco paid $39,000 for his
personal expenses. The 1995 tax return for Delawareco alone showed outstanding loans to shareholders of
$283,570. In 1996, the corporation paid $269,117 for Blatstein's personal expenses. The corporations

made a large down payment for his Bucks County estate and afterward payments on the remaining debt, and wages for a horse trainer and stable hand. The bankruptcy court summarized some of the evidence relating to Blatstein's personal expenses as follows:

At trial, Shoop testified that numerous personal expenses of the Blatsteins were paid by the various corporations, including expenses for a horse trainer hired by the Blatsteins, loan payments to Lift for money loaned to the Blatsteins for the purchase of their home, and payments of Blatstein's personal income tax debts owed to the Internal Revenue Service ("the IRS"). This testimony was confirmed by Blatstein and Lift during their trial testimony as well, and by numerous financial documents introduced into evidence.

Main II, 213 B.R. at 89. The bankruptcy court further found: Loans from the corporate defendants to the Blatsteins include the $140,000 down payment that Pier 53 made on the Blatstein residence, which was purchased in 1994. The monthly mortgage payments on this loan are made by Delawareco and Main. In addition, Delawareco and Columbusco made the payments on Blatstein's personal federal income tax liability. The Beratans were being repaid with $1,000 per week payments from Main and its successor entities, e.g., Reedco, [Chicken Fingers], and Columbusco.

Id. at 90.

In addition, Blatstein siphoned large sums of money as "loans" or "wages" from the corporations, notwithstanding their gross undercapitalization and their scurrying to borrow money from each other to stay afloat. For the year 1996, he drew $555,288 in gross wages from Waterfront Management Corporation. These funds were deposited in Lori's bank accounts. His personal IRS return for 1995 showed gross wages of almost $500,000. These funds also went into his wife's account, which this court now holds constituted fraudulent transfers.

Despite the bankruptcy court's negative findings as to Blatstein's credibility and his fraudulent activity to avoid paying creditors, the continuous and extensive payment of his personal obligations by the corporations and the non- observance of the corporate forms or ordinary business practices, the bankruptcy court, largely persuaded by Miller, refused to pierce the corporate veil. Miller, the defendants' expert, opined that there was nothing wrong with a corporation directly paying the expenses of a dominant shareholder. That

depends, however, upon whether the payments are occasional, the amount, and the financial status of the dominant shareholder, whether he is a person of worth or insolvent and without assets, and whether the corporations are financially stable or severely undercapitalized.

The Pennsylvania Superior Court in Hanrahan v. Audubon Builders, Inc. held that where corporate funds were utilized, in the form of direct payments, as is the case here, from the corporations' accounts for the shareholders' personal expenses, including expenses at their home, for personal jewelry, personal mortgage payments, and their son's private school tuition, piercing the corporate veil was appropriate. 614 A.2d at 753. The salient considerations here demonstrate that the personal expenses and other substantial personal obligations were paid and the large withdrawals permitted because Blatstein made the decision, he drew the checks, and corporate formalities were ignored.

I believe that Miller, who the judge acknowledged might have had "jaded perceptions" because of his prior experiences with debtors of dubious practices, misled the court. Miller applied his own personal "measuring stick" to reach for his conclusion that the corporate defendants were not Blatstein's alter ego. Id. at 92. Miller and the bankruptcy judge compartmentalized Blatstein's improprieties as isolated, discrete acts instead of viewing the totality of all the circumstances surrounding Blatstein's wide range of activities with the corporations. Miller attempted to minimize the number and amounts of Blatstein's personal expenses paid by offering his own formula. He took 1996 total gross revenues of the corporate defendants and divided it by Blatstein's personal expenses to come up with 3.89% as representative of the total gross revenues paid for personal expenses. With this approach, he ignored the net earnings of the corporations, treated the corporations as a single entity for this purpose, and gave no consideration to Blatstein's disregard of the corporate form and the separate personalities of the corporations and the individual. In DeWitt Truck Brokers, which we cited with approval in Pisani, the court noted that "[t]he conclusion to disregard the corporate entity may not, however, rest on a single factor." 540 F.2d at 687.

Miller concluded that technically no fraudulent transfers in the form of company loans occurred because the transfers were from solvent corporations. They were barely solvent, however, only if the loans to an insolvent Blatstein are considered in the calculation. Of greater relevance and importance than the solvency

of the corporations, however, in determining whether the corporate veil should be pierced are the character, quantity, and frequency of the intercompany loans and the payment of Blatstein's expenses, all made solely at Blatstein's behest and accomplished in total disregard of ordinary corporate business practices. These corporations not only made loans to each other but they directly issued their checks to creditors in payment of another corporation's bill and then booked the same as an inter-company loan. As the court noted in DeWitt Truck Brokers, "undercapitalization, coupled with disregard of corporate formalities, lack of participation on the part of the other stockholders, and the failure to pay dividends while paying substantial sums, whether by way of salary or otherwise, to the dominant stockholder ... has been regarded fairly uniformly to constitute a basis for an imposition of individual liability under the doctrine." 540 F.2d at 687.

Miller's opinion also addressed the legal factors reserved for courts under an alter ego analysis and exceeded the bounds of an accounting expert in his conclusion that piercing the corporate veil here was not justified. Relying on Miller's testimony, the bankruptcy court held that the plaintiffs failed to carry their burden. I disagree, for the record provides overwhelming evidence that Blatstein, as the president and sole stockholder of each corporation, the principal, if not the only stockholder, with sole check drawing power, ignored the corporate form, and treated the corporations as a single entity and his alter ego. A glaring example of Blatstein's disregard of the corporate entity is his agreement without appropriate corporate authorization with Transmedia Network, Inc. This is an organization which purchases food credit for its members and it pays the restaurant or night club fifty cents for every dollar of credit purchased. A provision of the agreement Blatstein entered into with Transmedia is that if one of the Blatstein restaurants closes, food credits can be used at all the other restaurants in which he has an interest. Thus, if the restaurant that was paid for the food credits received all the money and thereafter closed its doors or could not honor the credits, the other restaurants operated by the corporations would make good to Transmedia members. He had a similar arrangement with the Jefferson Bank under which checks written by one corporation which has not sufficient funds will be paid by one of the other companies that has sufficient funds available. Blatstein, during the life of the corporations, has systematically schemed to avoid his creditors and has cleverly used the corporations and Lori's bank accounts to thwart their efforts. He avoided his creditors by keeping no

bank accounts or property in his name to answer for his debts, but paid expenses and whatever other obligations he chose to pay with corporate funds. All family bank deposits, including his income, were in his wife's name. His personal purchases were made by one or more of the corporations, for he had no personal accounts of his own, including the purchase of his Bucks County estate. The corporations paid his personal income taxes, including personal withholding taxes owing for prior failed corporations. The corporations made large "loans" to him, although they were undercapitalized and in financial straits. Blatstein even admitted that four of these corporations, Delawareco, Reedco, Engine 46, and Columbusco, continued to make payments to him or on his behalf after they had been garnished. This is probative evidence of fraudulent conduct and abuse of the corporate entity. See Northern Tankers (Cyprus) Ltd. v. Backstrom, 967 F. Supp. 1391, 1413 (D. Conn. 1997).

Personal and corporate finances were intermingled. The bankruptcy court found that funds in the Gruntal account, of which $480,000 was deposited on October 3, 1995, came from Delawareco and was "used to purchase items for the Blatsteins' residence; to pay their mortgage; [and] to pay bills, predominantly tax liabilities, on behalf of the various corporate defendants." Main II, 213 B.R. at 94 (emphasis added). As the president and dominant stockholder of each corporation, time after time he disregarded the corporate structure of his companies for personal purposes.

In circumstances not as flagrant as we have here, this court in the past has pierced the corporate veil. There is such unity of interest, ownership and function between Blatstein and the non-debtor corporations that the separate personalities of the individual and the corporations no longer exist. This fusion of the corporate and individual personalities "may be satisfied by a showing of domination and control of the corporation, which occurs most often in the context of a parent-subsidiary relationship or of a closely held corporation." Note, Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L. Rev. 853, 854-55 (1982) (emphasis added).

In Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994), aff 'd, 514 U.S. 938 (1995), this court held that the corporate veil may be pierced when a corporation's affairs and personnel were manipulated to such an extent that they became nothing more than a sham to disguise the alter ego's use of their assets for his own benefit in fraud of creditors. The activities of the non- debtor corporations

here show that they played a major role in meeting Blatstein's personal needs in assisting him in his struggle to hinder and avoid his creditors. Proof of fraud, however, is not necessary to justify piercing the corporate veil, although fraudulent elements are present here. Under DeWitt, it is clear that "the corporate veil may be pierced in appropriate circumstances even in the absence of fraud or wrongdoing." Cunningham, 699 F.2d at 680.

The bankruptcy court was also influenced in its decision by the clearly erroneous belief that the non-debtor corporations "are financially stable and successful businesses." Main II, 213 B.R. at 91. If relevant, which I doubt, the evidence is to the contrary. Each corporation frequently paid bills for the other and checks shuttled back and forth in an effort to meet expenses and creditors, all of which reveals the fragile financial condition of the companies.

Despite the absence of any documents evidencing the "loans" to Blatstein, their terms as to repayment, interest, or collateral, or any corporate authorization of the loans, formal or informal, the court concluded that corporate formalities were observed because each corporation had its own bank account and kept its own financial records. However, separate bank accounts and records for each corporation are not alone sufficient proof that corporate formalities were observed and the corporate entity respected, particularly when the bank accounts were each subject to Blatstein's exclusive control and used for his personal purposes. The records kept by each corporation are ordinary business records without any distinctive corporate characteristics except that each corporation kept its own.

Shoop admitted that several weeks before his final deposition in this case, Lift told him to clean up his records, which resulted in the reduction of Blatstein's loan balances "because my records were inaccurate." Shoop also acknowledged that during his service as Controller from July 12, 1994 through 1996, he never issued a 1099 form to Lift showing the payment to him of interest on his loans to the corporations. He explained these annual lapses as an "oversight." He also admitted issuing a check to Lift for $9,000 on September 18, 1996, at Lift's direction which he could not explain. Although the foregoing illustrates that the corporate records were not always accurate as to Blatstein and Lift, they do show that in 1996, the corporations paid for Blatstein's personal expenses of $269,117.16 plus his wages for the year of $558,288. (256a). In undercapitalized corporations struggling to meet their current expenses, a withdrawal

of $827,405 by Blatstein in one year constituted a "siphoning of funds of the corporation by the dominant stockholder." Pisani, 646 F.2d at 88.

Although the majority acknowledges that "the Blatsteins did not run their corporations as strictly separate entities," it concludes that they did uphold the corporate form sufficiently because the corporations kept separate records and bank accounts, and entered on the books all loans the corporations made to each other and to the shareholders. Maj. Op. at 21. I do not believe that under the law of this circuit, this one factor should defeat an equitable result and bar the piercing of the corporate veil in light of the many factors present that demonstrate the unity of interest and ownership of Blatstein and his corporations that commenced with the initial fraudulent transfers from Main to Reedco.

When one views the total picture, illuminated by the relevant factors set forth in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., which were adopted by this court in United States v. Pisani, justification for piercing the corporate veil is clear. First, the corporations were grossly undercapitalized. Second, corporate formalities were never observed, and officers and directors were non-functional. Although the corporations kept separate bank accounts and separate records, this one factor is not determinative. Third, Blatstein, the dominant and, in my opinion, the sole stockholder, flagrantly siphoned funds from the corporations. He commingled personal and corporate funds. Fourth, Blatstein alone drew checks on the bank accounts of each of the corporations and corporation funds were used extensively for all of his personal obligations and expenses. Fifth, Blatstein used the corporations to hinder and delay creditors, including the fraudulent transfer of some of Main's assets in the face of garnishment proceedings to Reedco and Columbusco, and the fraudulent transfer of funds siphoned from the corporations to his wife's bank accounts. Finally, the total picture of Blatstein's activities portray that his corporations were "a facade for the operations of the dominant stockholder." Pisani, 646 F.2d at 88.

Accordingly, I respectfully dissent from the majority's decision to affirm the district court's order affirming the bankruptcy court's determination not to pierce the corporate veil of Blatstein's corporations.

A True Copy: Teste:

Clerk of the United States Court of Appeals for the Third Circuit 36

FOOTNOTES